IN THE MATTER OF WILLIAM B. COLSEY, III
AN ATTORNEY-AT-LAW.

Argued May 8, 1973—Decided June 19, 1973.

*Mr. John Lee Madden,* for the order.

*Mr. Joseph H. Kenney* argued the cause for respondent (*Messrs. Archer, Greiner and Reid,* attorneys).

PER CURIAM. Respondent is charged with participation in a corrupt transaction involving the payment of moneys to public officials.

Respondent represented James Chiusano, a builder, whose corporation, White Birch Realty Corp., wanted to develop lands for housing in Gloucester Township. Respondent sought to obtain planning board approval. The negotiations were quite extended. An impasse occurred when the mayor, Joseph Menna, said the township would want White Birch Realty Corp. to donate 15 acres for a municipal building.

The acreage thus sought by Menna was very valuable. Respondent says he asked a friend, John Pasquariello, to intervene. Pasquariello was the deputy mayor of another municipality. Respondent explained that he enlisted Pasquariello's aid because Pasquariello could tell Menna that

five or six acres would suffice for a municipal building as was the fact in Pasquariello's municipality. After meeting with Menna, Pasquariello reported to respondent that Menna was so persuaded, but that Menna wanted a "political contribution" of $25,000 to $30,000 in connection with an impending political contest.

According to respondent and Chiusano, both were outraged by this demand. It was not the thought of a "political contribution" that was repugnant, but rather the amount Menna sought. To respondent and Chiusano, a few hundred dollars would be appropriate; neither had experienced a contribution in excess of $1,000 in dealing with local government. Chiusano indignantly rejected the request. But Chiusano later relented; the project still needed final subdivision approval, and further, Chiusano wanted no trouble on the job. He told respondent he would pay $15,000.

We interrupt the narrative to say there is not the slightest doubt that everyone concerned, including respondent, knew the payment would be corrupt,[1] involving bribery or extortion or both depending upon statutory definitions of the offenses. One would be naive to suppose that respondent or anyone else thought the payment was a "contribution."

[1] After the ethics committee filed its presentment with us and our order to show cause issued, respondent sought a remand to the committee. We denied the motion because it did not appear what relevant proof would be offered. We authorized the motion to be renewed at the oral argument and at the argument the subject was pursued. Counsel for respondent said he had approached the defense of the ethics charge on the assumption that "bribery" was involved rather than "extortion." But with respect to the ethics charge, it would be no defense that respondent's conduct, if unethical, related to "extortion" rather than "bribery." Counsel for respondent agreed that respondent had testified fully as to his understanding and his role and that there was nothing he could add to the record. That record consists of the transcript of the testimony given by respondent, Pasquariello and Chiusano in the federal prosecution which arose out of this transaction, which transcript was admitted without objection, and also the testimony of Pasquariello and respondent before the committee. We granted respondent leave to file proof as to character.

This brings us to respondent's role in the matter. Respondent says that when Chiusano decided to pay $15,000, respondent suggested that the payment be in "cash." The reason he gives is that he knew there was a political rift within the official family in the township and it could be hurtful if the dissidents learned the mayor had received the contribution. It is not evident how cash would be more assuring in that regard, but if that postulate is accepted, the manner in which the cash was obtained remains incomprehensible. Chiusano had $6,500 in cash which he delivered to respondent and which respondent held as cash. Chiusano needed $8,500 more to complete the required total of $15,000. Respondent advised Chiusano to obtain the additional $8,500 through the medium of a check to respondent's order which he would cash at his bank. But, says respondent, it occurred to him that if Internal Revenue Service should learn of the check, it might not accept the explanation that he was a mere conduit and might insist upon taxing respondent with respect to it. Hence respondent asked Chiusano to add $4,000 to the $8,500, thereby increasing the check to $12,500.[2] What remains unexplained under that thesis is

---

[2] Respondent testified before the committee:

"Q. Then, why was it necessary for you to receive the $4,000? A. Well, again, Mr. Kessler; it did show as a transaction to me in the amount of $12,500. God forbid that Mr. Chiusano were not around a year or so later and there was a tax audit and I couldn't explain that it wasn't truly income. It was a caution on my part to allow for a tax incident that may or may not arise to me. I wasn't that concerned from the viewpoint of Jack [Chiusano] because I have a continuing relationship with him. In other words, if there were tax incidents to me, if it appeared as income to me, the most would be said was I was going to have to pay tax and if I were short, I am sure he would have made it up to me.

Q. But, attorneys are constantly receiving sizable sums of money to hold in escrow to apply to the use of clients, such as pay off loans and so on. Why would this be different than that? A. It wasn't legally an escrow matter as such, Henry. It was a check I was turning over to cash."

why Chiusano or his corporation did not cash a check for $8,500 and thus save $4,000. At any rate, the check for $12,500 was drawn to respondent's order, endorsed by respondent, and then by his secretary who cashed the check at respondent's bank and deposited $4,000 in cash in respondent's bank account. That bank account was respondent's individual account and not the account of the law firm in which he was a partner.[3]

The cash sums of $6,500 and $8,500 were placed by respondent in a brown envelope, and respondent again called on his friend, Pasquariello, to make delivery. Pasquariello, who insisted in his testimony that he was just running an errand, said that before he could make delivery he was contacted by a member of the other local faction, one Donald Mitchell, who laid claim to a share. Pasquariello testified that he was troubled by this development, and after mulling it over for a couple of weeks, he decided to split the $15,000 between Menna and Mitchell. This he did, and without consulting either respondent or Chiusano. Pasquariello's testimony is remarkable, and incredible, but we draw no inference on that account against respondent.

The payment of the $15,000 led to federal indictments against Menna and Mitchell. Menna pled guilty and Mitchell was convicted upon trial.

The foregoing establishes inescapably that respondent knowingly participated in a criminal event by aiding the participants, whether Chiusano or Menna was the moving party. Respondent counseled Chiusano as to how to make the payment, cashed a check to his own order to facilitate the transaction, and arranged for the transmittal of the money.

---

[3]Respondent testified before the committee:
"Q. Why wouldn't you run it through the firm account? A. Again, I handled it personally because it wasn't meant to be a fee to me. It could have been construed as a fee."

And it is impossible to avoid the conclusion that the check of $12,500 to respondent's order was designed to mask the transaction because of its illegal character. Respondent, a member of the bar, received $12,500 which on its face could suggest the payment of a fee for services. We are convinced the check was intended to create that appearance.

As we have said, there is no sensible explanation as to why Chiusano would part with $4,000 when he or his corporation could cash a check for $8,500 if there was nothing to hide. The sum of $4,000 could have been compensation to respondent for his role in the pay-off, but this respondent denies. He says he feared that Internal Revenue might one day learn of the check and not credit his explanation that he was a mere "conduit." Curiously, respondent says that before he filed his income tax return, the federal authorities had learned he was a mere conduit of the $15,000 and in fact the authorities were pursuing Menna and Mitchell on that factual premise. That being so, respondent could safely have returned the $4,000 to Chiusano before he filed his 1970 tax return. Instead his tax return, dated April 14, 1971, reads this way:

"Statement of Income Explanation
Primarily I practise law through the partnership of Powell, Davis, Dietz & Colsey, but in addition I do individual consulting work outside of the firm, thus, additional statement of income follows:
\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*
2. Whitebirch Realty Co.　　　$12,500.00"

Thus respondent told the Internal Revenue Service that the entire amount of the check represented a fee. This return of course contradicts respondent's "conduit" thesis. Indeed, on the "conduit" thesis, respondent should have included the $6,500 Chiusano gave him in cash if he feared that being a conduit held the risk that the moneys handled would be taxable to him.

The record shows that Chiusano had treated the $12,500 as a fee for legal services and had capitalized that item as a

cost of the project. The evident purpose would be to obtain an income tax benefit with respect to the payment when the property is sold, a tax treatment which would be unlawful whether the payment was a "political contribution" or an illegal payment. Both respondent and Chiusano insist there was no understanding between them as to White Birch's tax handling of this item. But it happens that respondent's tax return would support the corporation's effort to obtain a tax advantage by cloaking the nature of the payment.

This much is clear: there is no explanation of the check consistent with honesty. If the purpose to obtain an illegal tax advantage for the client is excluded, the inference must be that respondent recommended a check to his order to provide cover for Chiusano, or Menna, Mitchell and their associates, or for all of them, with respect to the crime involved in the $15,000 payment. We are satisfied that respondent never intended to tell the Internal Revenue Service that he was a mere conduit. The agreement had to be that if the check came to light, respondent would treat the face amount of $12,500 as income to him for services rendered. Respondent could not have said anything different without revealing the corrupt payment to Menna and Mitchell and his own role in that affair. Chiusano's willingness to pay a $4,000 override is understandable only in those terms.

That respondent breached his ethical duty is plain enough. The question is whether discipline short of disbarment would be appropriate. We think it would not. Respondent was not himself the victim of extortion. It was his client who was the target. The transaction involved pollution of public office. Corruption there attacks the vitals of our social order. Respondent took an active part in that affair. Indeed he used the fact that he was a member of the bar as part of the mask for the crime by creating the appearance that a professional fee was involved. Such misconduct cannot be reconciled with fitness to practice law. Respondent's name is stricken from the rolls.

*For disbarment* — Chief Justice WEINTRAUB, Justices JACOBS, PROCTOR, MOUNTAIN and SULLIVAN and Judges CONFORD and COLLESTER—7.

*Opposed*—None.