IN THE MATTER OF ARTHUR SABATINO, AN ATTORNEY AT LAW.

Argued May 21, 1974—Decided July 30, 1974.

*Mr. Robert T. Hueston* argued the cause for the Union County Ethics Committee.

*Mr. Robert I. Ansell* argued the cause for respondent (*Messrs. Anschelewitz, Barr, Ansell & Bonello,* attorneys).

PER CURIAM. This disciplinary case grows out of an alleged conspiracy to bribe public officials of Jackson Township. It has this factual background:

In 1970, Doral Construction Company, the principals of which were Frank Vogel, Murray Eisdorfer and Morris Rattner, owned a senior citizens apartment complex in Jackson Township which had been constructed under a use variance grant that restricted occupancy to persons over 62 years of age.

Apparently there was an insufficient demand for this type of occupancy and the owners were confronted with substantial vacancies and resultant serious financial problems. Consequently, apartments were rented to persons regardless of age. At about the same time formal applications were filed to have the restriction lifted.

The Township took no final action on these applications. Instead, in 1969, it filed suit in the Superior Court, Ocean County, and obtained an order directing Doral to remove all tenants under 62 years of age by December 31, 1969, and imposing a fine of $500 per week thereafter until compliance was had. When respondent was consulted by Vogel in March 1970, some $4,500 in fines had already accumulated.

Respondent testified that Vogel retained him essentially to have the restriction lifted. Ancillary thereto, he said that Vogel directed him to obtain $9,000 from Eisdorfer which was to be used to pay the $4,500 in fines, reimburse Doral for corporate money which Vogel said Eisdorfer had taken for his personal use, and to pay respondent a $500 fee for his services. According to respondent, Vogel said Eisdorfer was "a little bit wacky" and told him to just humor Eisdorfer and "agree with anything he says" until the $9,000 was produced.

Respondent claims that Eisdorfer initiated the discussions concerning payoffs to public officials and that he, following Vogel's instructions, went along merely in an effort to get Eisdorfer to deliver the $9,000. Respondent insisted that he was unaware that Vogel and Eisdorfer were actually involved in an attempted bribery.

Unknown to respondent, on March 23, 1970 Eisdorfer had gone to the prosecutor's office and reported that he had been approached by Vogel and a friend and told that the restriction on occupancy could be lifted by payment of a bribe of $9,000 to certain public officials. Eisdorfer agreed to cooperate with the prosecutor to ascertain if in fact a bribe was going to be paid, and was provided with a tape recorder and instructed in its use.

Recordings were made of telephone conversations Eisdorfer had with both respondent and Vogel, and a personal conversation between Eisdorfer and respondent in the latter's office on April 7, 1970. During this conversation respondent concededly stated that the $9,000 Eisdorfer was to deliver had to be in cash, and was to be used to bribe public officials.

On April 17, 1970, respondent was summoned to the prosecutor's office and, after hearing the recording of his April 7th conversation with Eisdorfer, gave a statement in which he admitted knowing that a bribe was going to be paid to certain persons through Vogel. A tape recording was made of this statement.[1]

The Union County Ethics Committee,[2] after considering these recordings and hearing testimony from several witnesses, including respondent and Vogel (Eisdorfer had died

---

[1]Respondent also agreed to cooperate with the authorities and was given a recorder which he used to tape telephone conservations he had with Vogel and personal conversations between respondent, Vogel, and a Jackson Township official who was later indicted on bribery charges.

[2]Actually; the Committee acted through a panel of three members. *R.* 1:20–1(c).

in a fire about two years earlier), concluded that respondent's and Vogel's testimony that respondent had no knowledge of the bribery conspiracy was not worthy of credibility.

The Committee found:

A. Respondent represented to Eisdorfer that he could and would bribe public officials with the funds he sought from Eisdorfer.

B. Respondent attempted to obtain money from Eisdorfer which respondent represented to Eisdorfer was to be used to bribe public officials.

C. Respondent knowingly participated in a conspiracy to bribe public officials.

Respondent admits that findings A and B are factually correct. His explanation is that he was just humoring Eisdorfer to try and get the $9,000 from him and although he told Eisdorfer the money was to be used for a payoff he was unaware that Vogel and Eisdorfer actually intended to bribe public officials. He vehemently denies the correctness of finding C and insists he was an innocent dupe in the matter until he was summoned to the prosecutor's office on April 17, 1970.

We have reviewed the entire record and we are satisfied that respondent's story that he was an innocent dupe who talked about bribery, but did not really know that an actual bribery was being attempted, is incredible.

The record shows that respondent in his earlier telephone conversations with Eisdorfer refused to discuss details over the telephone. In his April 7, 1970 personal conversation with Eisdorfer, held in respondent's office where respondent probably thought he could talk freely, he told Eisdorfer that he had refused to discuss the matter over the telephone because he did not know whether his or Eisdorfer's phones were tapped, adding that he certainly was "not going to talk about paying off politicians on the telephone * * *."

In the same conversation respondent told Eisdorfer that he would not take a check for the $9,000 because, "Well,

they have to be paid in cash * * *." Respondent also said he would not give Eisdorfer a receipt for the money, but that he would get an agreement from the people involved "as to what their [sic] supposed to do in order to get their money." Eisdorfer then asked if he could get a copy of the agreement upon which the following exchange took place:

S[abatino]   Oh this is not going to be a written agreement. Murray don't you understand what your [sic] doing here?
E[isdorfer]  No, I don't.
S.           Is illegal? They could go to jail.
E.           No I didn't know that.
S.           You can't bribe a Township Official, to do something.
E.           So the agreement you will get will be what?
S.           Verbal agreement.
E.           Verbal agreement? Now do you trust those people?
S.           I trust them because I have the money. If they don't produce, they don't get paid, it's just that simple.

After a few more questions and answers in the same vein, respondent further explained how it would work:

S.           When these things are done Murray, there's one guy that acts as the spokesman.
E.           Who's the spokesman?
S.           Well that's this fellow down there, he's the spokesman, now he knows he's got so many votes, now he gets the money, what he does with it nobody cares and he has to pay four, five or six other —
E.           Is he one of the politicians?
S.           Of course, of course he is.

Respondent's statement to the prosecutor on April 17, 1970 is also significant. He had been told that he was suspected of being involved in a conspiracy to commit bribery, and much of what he said in that statement was therefore self-serving. Nevertheless, upon being pressed as to whether he knew that Vogel and Eisdorfer planned to commit bribery, he said this:

Q. You knew this was illegal, right?
A. I knew what they were trying to do was illegal yes.

Q. You knew that they were going through Vogel a bribe was going to be paid to certain persons having influence in the granting of the zoning variance, is that correct?
A. I was under the impression that this is what they intended to do, yes.

Respondent argues that his incriminating remarks must be read in context and in the light of his and Vogel's uncontradicted testimony at the hearing that Vogel had not told respondent anything about the actual bribery. The tapes of an April 17th telephone conversation between respondent and Vogel, and an April 20th personal conversation between the same parties are said to demonstrate the veracity of respondent's story because in these tapes respondent professed ignorance "about what's going on or who's supposed to get what, or what your even doing with this money" to which Vogel merely said he would explain it at a subsequent time.[3]

This contention is at best tenuous. By this time respondent knew that a criminal prosecution was likely and many of the things he said on these tapes give every indication that he was trying to make a record playing down his role in the affair. It is to be noted that on the April 20th tape when respondent began to say that he "never understood —" Vogel answered, "All right, I went over this with you, see you've got so many things on your mind too, you don't remember either. I went over a lot of this with you. The last time we were having coffee over there we went over this." Respondent says that Vogel's comment refers to an alleged meeting with respondent the previous day which conversation was not taped. It is apparent to us that Vogel was not referring to any discussion had on the previous day.

In short, the credible evidence in the record clearly and convincingly requires the conclusion that respondent knowingly participated in a conspiracy to bribe public officials.

---

[3]Vogel was unaware that the conversations were being recorded.

We come to the question of discipline to be imposed. Respondent's dereliction is most serious. Bribery of public officials is a cancer that destroys the very concept of democratic government. There are no mitigating circumstances. Neither respondent nor his client was the victim of an extortion demand. Respondent indicated that this was a way of doing business with public officials; "it's done a thousand times a week." His cooperation with the authorities came only after he realized that the prosecutor had evidence of his involvement and that he could be prosecuted for conspiracy to bribe a public official. He cannot point to a long record of exemplary conduct as an attorney since he was admitted to the bar only two years prior to his involvement herein. Nor can he plead youth and inexperience as he was nearly fifty years of age at the time and had been engaged in the real estate business as a licensed real estate broker since the early 1950s. He has demonstrated his unfitness to practice law. *In re Colsey,* 63 *N. J.* 210 (1973). The only appropriate discipline is disbarment. Respondent's name is stricken from the rolls.

*For disbarment*—Chief Justice HUGHES, and Justices JACOBS, MOUNTAIN, SULLIVAN, PASHMAN and CLIFFORD—6.

*Opposed*—None.

## ORDER

It is ORDERED that ARTHUR SABATINO of Union be disbarred and that his name be stricken from the roll of attorneys at law of this State; and it is further

ORDERED that the said ARTHUR SABATINO be and hereby is permanently restrained and enjoined from practicing law, effective August 15, 1974.