**In the matter of Arthur Lawrence ABRAMS, an Attorney at Law.**

**Misc. No. 74-53.**

United States District Court,
D. New Jersey.

Dec. 10, 1974.

Sills, Beck, Cummis, Radin & Tischman, Newark, N. J., for Arthur Lawrence Abrams.

## OPINION AND ORDER

By orders dated June 3 and June 19, 1974, the Supreme Court of New Jersey suspended Abrams from the practice of law for 1 year, effective July 1, 1974, and until the further order of the Court. These disciplinary proceedings on order to show cause under Local Rule 7 followed.

The facts and circumstances are adequately detailed in the opinion of the Supreme Court, 65 N.J. 172, 320 A.2d 471 (1974) and need not be repeated here. It was recognized there that Abrams' participation in activities leading to the payment of a bribe to a public official was improper. It was also indicated that his interest in salvaging his investment share of the client's enterprise, to protect which the bribe was paid, and the existence of extortionate elements in the demands of the public officials, were mitigating factors to be given effect in selecting the degree of disciplinary action to be taken.

We view the matter somewhat differently. The acquisition of an interest in the client's enterprise was obviously a factor that interfered with the exercise of free judgment on behalf of the client. Code of Professional Responsibility, Canon 5, EC 5–1, 5–2 and 5–3; DR 5–103 and 5–104.

Another factor is that Abrams accepted a share of a real estate commission paid by the City of Jersey City on the sale of property on public bid. He deposited that share in his trust account, explaining that he considered it to belong to the client, but no credible explanation was provided for the making of the payment in the first place. The commission aspect bears all the indications of a device to divert public funds into channels from which they could be repaid secretly to the public officials. Justification for its payment is not satisfactorily shown.

We see no basis for distinguishing this case from In re Colsey, 63 N.J. 210, 306 A.2d 72 (1973). Professional misconduct, like fraud, takes many forms. Variations in detail are not significant when the underlying character is the same. A lawyer who countenances and assists client misconduct for the payment of an extortionate bribe countenances two offenses: one, the extortion and two, the bribe. His minimum duty in such circumstances is to advise the client against it in the strongest terms, and if the client persists, to disassociate himself from the matter promptly and completely. And, since a communication in the course of

legal service sought in aid of the commission of a crime or fraud is not privileged, N.J.Ev. Rule 26(2)(a), he may be under a further duty to report the matter to proper authorities.

■ Abrams is a member of the bar of this Court by derivative admission on motion, by virtue of his status as an attorney licensed to practice by the Supreme Court of New Jersey. Local Rule 4. Ordinarily, a suspension, disbarment or censure by the Supreme Court of New Jersey will result in corresponding action here. Local Rule 7. But this accommodation does not necessarily suffice to discharge the independent obligation of this Court to take appropriate action on its own rational analysis and determination, although in doing so it will hold the greatest respect for, and give due weight and consideration to, the views of the Supreme Court. In re Ruffalo, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968); In re Wilkes, 494 F.2d 472, at 474–475 (C.A.5, 1974).

Then, too, there will be cases in which this Court will act first. If an attorney be convicted of a crime in this Court, or commits an act of professional misconduct in connection with a matter before this Court, a disciplinary proceeding may begin here and be concluded here, or may take the form of a temporary suspension here pending disciplinary proceedings here or before the Supreme Court. In either case, this Court would duly inform the Supreme Court of the pendency of the matter, and of the outcome, so that it might proceed to carry out its functions under N.J.Const.1947, Art. 6, § 2, par. 3. The same would be true in the case of attorneys disciplined here who are admitted to the practice of law in other jurisdictions.

Differences in disciplinary action as between this Court and the Supreme Court could give rise to practical difficulties for the disciplined lawyer. If the Supreme Court's discipline be more severe than ours, it will likely control the practical impact because the ability to practice before this court would have little meaning without the ability to practice law in New Jersey. If this Court's discipline be more severe, the practical impact will be lessened considerably by the lawyer's ability to practice law in New Jersey although not in this Court.

■ Since the instances in which the two Courts will have different views are not likely to be frequent, and since the practical impact of the Supreme Court's view will necessarily predominate, we do not think the risks are sufficiently great to warrant the withholding of different views when they are held by this Court.

### ORDER

■ For the reasons stated, it is hereby ordered that the name of Arthur Lawrence Abrams be, and the same hereby is, stricken from the roll of attorneys permitted to practice before this Court, and until the further order of the Court.

> s/ LAWRENCE A. WHIPPLE,
> Chief Judge
>
> s/ JAMES A. COOLAHAN,
> Senior District Judge
>
> s/ GEORGE H. BARLOW,
> District Judge
>
> s/ FREDERICK B. LACEY,
> District Judge
>
> s/ VINCENT P. BIUNNO,
> District Judge
>
> s/ HERBERT J. STERN,
> District Judge
>
> s/ H. CURTIS MEANOR,
> District Judge

COHEN, Senior District Judge, with whom Judge CLARKSON S. FISHER, joins, (dissenting):

It is well settled that the federal judiciary may review the results of a state court proceeding involving the discipline of an attorney. Both the scope of such a review, and the weight to be accorded a state court's disposition are set forth in Selling v. Radford, 243 U.S. 46, 37 S.Ct. 377, 61 L.Ed. 585 (1917). A case of more recent vintage which addressed similar questions, and affirmed the vitality of *Selling* was Theard v. United

States, 354 U.S. 278, 77 S.Ct. 1274, 1 L. Ed.2d 1342 (1956). While I do not question the power of this court to impose a sanction different from that imposed by the Supreme Court of New Jersey, I question the advisability of such a course of action. Furthermore, although this court may act independently of the state court determination, such independence is narrowly confined by the language of *Selling* itself. The Supreme Court took pains to mark the limited scope of federal review:

". . . [W]e should recognize the condition created by the judgment of the state court unless, from an intrinsic consideration of the state record, one or all of the following conditions should appear: 1, That the state procedure, from want of notice or opportunity to be heard was wanting in due process; 2, that there was such an infirmity of proof as to facts found to have established the want of fair private and professional character as to give rise to a clear conviction on our part that we could not, consistently with our duty, accept as final the conclusion on that subject; or 3, that *some other grave reason* existed which should convince us that to allow the natural consequences of the judgment to have their effect would conflict with the duty which rests upon us not to disbar except upon the conviction that, under the principles of right and justice, we were constrained so to do." 243 U.S. at 51, 37 S.Ct. at 379. (emphasis supplied)

No question is presented here as to whether the hearing accorded the attorney by the state court was consistent with due process, nor is there any dispute regarding the facts. What, then, is the "grave reason" for this court to pronounce a harsher judgment than that imposed by the state judiciary? I must confess that I cannot discern in the majority opinion the answer to this crucial question. The majority cites In re Ruffalo, 390 U.S. 544, 88 S.Ct. 1222, 20 L. Ed.2d 117 (1968) and In re Wilkes, 494 F.2d 472 (5th Cir. 1974) in support of

its position that the federal judiciary must independently act in disciplinary matters. These cases, however, simply affirm the principles of due process which must be followed in the conduct of such disciplinary proceedings. Neither these cases, nor the instant case, deal with a "grave reason," which would justify a different disposition by this court.

Notwithstanding the absence of a response to the crucial question of "grave reason," I dissent as a matter of policy. Assuming that the purpose of the harsh sanction advocated by the majority is to deter future wrongdoers, deterrence is certainly not advanced by the possibility that Abrams may, at some future time, be permitted to practice in the state courts. While there may be cases which might justify disparate treatment, I am not convinced that this is such a case.

The majority takes issue with the Supreme Court of New Jersey for distinguishing this case from In re Colsey, 63 N.J. 210, 306 A.2d 72 (1973), where the attorney was disbarred. Placing aside for the moment the question of whether this court should engage in a contest with the State Supreme Court over the merits of the distinction, this case is distinguishable from *Colsey* in at least three ways: (1) in this case, the disciplined attorney himself, as a part owner of the business, was a victim of the extortion; (2) here, the disciplined attorney did not retain part of the "pay-off" as a "fee"; and finally, (3) unlike *Colsey* there was no deliberate attempt in this case to perpetrate a tax fraud.

I do not find the state court's distinction to be without basis. The majority's position, simply stated, is:

"Professional misconduct, like fraud, takes many forms. Variations in detail are not significant when the underlying character is the same." *Ante* at 1211.

This is an oversimplification of the facts and of the state court opinion.

I do not quarrel with the sentiments expressed by the Court with regard to unethical conduct; in fact, I whole-

heartedly endorse such a standard for all attorneys in all states. In my opinion, however, such sentiments are largely irrelevant to the true import and impact of the majority opinion.

It is quite understandable that the Court should be reasonably exercised and concerned with the improprieties of members of the Bar, especially in light of the increased awareness of the public to such activities. In this Watergate area of "dirty tricks, laundered money," perjury, obstruction of justice, corruption and related matters, one must not lose sight of the more mundane aspects of the legal and judicial process, as it pertains to the interrelationship of the federal and state judiciary. In its effort to weed out unethical practices, wherever and whenever they occur, the Court may have lost sight of the past practice in this, and other districts, regarding disciplinary proceedings.

For the first time in the history of the District of New Jersey, or for that matter in the history of any district within the Third Circuit, our Court has refused to be bound by a state court determination in a disciplinary matter. No explanation is given for this sharp divergence from past practice other than the independence of the federal judiciary. Certainly the independence of the federal judiciary cannot be the "grave reason" required by *Selling*. Although the majority opinion recognizes the derivative nature of admission to the federal bar, it glosses over the remainder of the State machinery with regard to bar admission and attorney discipline. Some elucidation would be appropriate in these circumstances.

Fully forty-five of the New Jersey Court rules, with myriad subdivisions, deal with nearly every imaginable aspect of qualifications for admission to the bar, actual admission, and any subsequent discipline of one who is admitted. There is in existence in New Jersey a comprehensive and thoughtful scheme for dealing with the cumbersome and ofttimes complex questions of

who should and who should not be authorized to engage in the practice of law.

Admission to practice in our courts is derivative. It is the state who conducts bar examinations. It is the state who maintains committees on character and fitness and ethics. The federal courts have no such machinery and rely exclusively on the state system in determining who shall be admitted to its bar. To make an independent evaluation of applicants to the federal bar would be expensive, cumbersome and unnecessary. Likewise, disciplinary preceedings in our courts ofttimes follow upon the coattails of extensive records and hearings in the state courts and their duly authorized committees. Therefore, in a sense, our disciplinary proceedings are also derivative because based in part on a previously compiled state record.

With this structural background in mind, it is difficult to see the basis for this sudden surge of independence on on the part of our Court. Disparity does little to bolster the public respect for the judiciary and does less for federal-state cooperation.

In this regard let us examine the possibly anomalous results of this newly found independence. An attorney suspended from practice for one year by the state system, but disbarred by the federal system, would thereafter be permitted to practice in the state courts but not in the federal courts. Is this person a practicing attorney or not? Are the ethical sensitivities of the federal bench so much greater than their state counterparts? What is the public to think of such a situation, especially with its current disenchantment with the legal profession?

What of comity? After long years of joint efforts to ease the natural tensions between two parallel judicial systems operating within the same state, are we to totally disregard all notions of coordination? There are already enough areas of potential friction between the state and federal judiciaries. *See* Helfant v. Kugler, 500 F.2d 1188 (3rd Cir.

1974) cert. granted, —— U.S. ——, 95 S.Ct. 492, 42 L.Ed.2d 292 (Nov. 19, 1974). On August 15, 1974 the Conference of Chief Justices unanimously passed a resolution urging greater cooperation and communication between state and federal courts. (See Appendix A). I am reluctant to carve out yet another area of possible abrasiveness, particularly where the facts do not require such action. The majority believes, however, that an independent disciplinary proceeding is necessary. While Selling v. Radford, *supra*, permits such an independent examination, it does so within narrow limits. I believe that my colleagues have transcended those limits. I believe that under certain circumstances, a sanction other than the one imposed by the state court might, perhaps, be appropriate. I can discover no "grave reason" for departing from the judgment of the Supreme Court of New Jersey in this case. Such a course of action flies in the face of comity, and should be undertaken with great reluctance. As has been pointed out in another context, "comity" is

> "a proper respect for state functions, a recognition of the fact that the entire country is made up of a union of separate state governments, and a continuance of the belief that the National Government will fare best if the states and their institutions are left free to perform their separate functions in their separate ways." Younger v. Harris, 401 U.S. 37, 44, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971).

With all due respect, I do not believe that the majority has shown the proper regard for what has traditionally been a state function. I conceive the majority opinion to be analytically unsound, and an unwise disservice to the concept of federal-state cooperation.

It would seem to be incumbent upon our court to engage in extensive discussions and negotiations with the New Jersey Supreme Court in order that some orderly procedure might be established to integrate and accommodate the state and federal disciplinary systems. The Supreme Court of New Jersey has already indicated its willingness to conduct such joint efforts. A system should be devised whereby the federal bench can review the evidence, make recommendations, submit its views, and generally participate in any judicial disciplinary hearings on the state level. But the New Jersey Supreme Court should render the decision and the federal bench, as a matter of policy should be guided thereby. This is the only method which would recognize the derivative nature of practice in the federal courts.

Of course, our court should be more concerned, than the State courts, where a disciplinary proceeding is based upon misconduct of a federal official, or upon conviction of a federal offense, or upon some transgression committed during an appearance in a federal court. In instances such as these, where the federal system gives rise to the disciplinary proceedings, the state·court has displayed no reluctance in taking appropriate action with dispatch. Heretofore, the New Jersey Supreme Court has exercised a diligent watch over just these sorts of transgressions. *See e. g.*, the most recent case of In the Matter of Turco, 66 N.J. 50, 327 A.2d 668 (1974), wherein an attorney who had previously pleaded guilty to tax fraud in the federal court was subsequently disbarred from practice in the state courts. This is but one example of the good faith effort on the part of the State Supreme Court to accommodate the federal system. Furthermore, it serves as another example of the cooperation which has heretofore existed and which is now threatened.

Finally, the majority opinion contends that disparity between the state and federal systems will be infrequent. It cannot be said with certainty that differences in opinion will be infrequent. We have one example before us—how many others are lurking in the "corners of our profession?" Even one difference of opinion requires some joint federal-

state effort at resolution. The time has come to openly confer with the members of the New Jersey Supreme Court in the hopes of arriving at an expeditious solution to the problem which now threatens to rend asunder the fragile fabric of cooperation between the two systems. For the present, however, I strenuously resist any effort on the Court's part to seize this particular opportunity to impose a sanction different from that of the New Jersey Supreme Court.

As Chief Justice Hughes has recently pointed out in a letter to Chief Judge Whipple of our court: "After all, we act under like constitutional obligations, have equally high respect for our profession and serve the same public in the administration of justice."

For the above reasons, I would direct, as did the State Supreme Court, that Arthur Lawrence Abrams be suspended from the practice of law for one year, and until the further order of this Court.

### APPENDIX "A"
### RESOLUTION

### VIII

WHEREAS, the Conference of Chief Justices in 1971 endorsed the efforts of the Chief Justice of the United States to improve the channels of communications between state and federal courts and to eliminate abrasiveness in state-federal judicial relationships; and

WHEREAS, much improvement between state and federal judicial relations has resulted from an interchange of ideas and a discussion of mutual problems between state and federal judges through State-Federal Judicial Councils; and

WHEREAS, in recent months there have been in a few federal district courts and circuit courts of appeals certain decisions which threaten to negate the effectiveness of efforts to improve state and federal judicial relationships in that these federal courts, below the United States Supreme Court level, unreason-

ably have invaded areas which historically and traditionally are recognized to be within the exclusive jurisdiction of state courts, as for example the matter of state bar admissions and the internal administration of state court systems;

NOW, THEREFORE, BE IT RESOLVED by the Conference of Chief Justices duly assembled in Plenary Session on August 16, 1974, as follows:

1. That each state judicial system is urged to continue its efforts to bring about a cooperative and cordial relationship between state and federal judicial systems through open communication and with the interchange of ideas and mutual recognition of the responsibilities of each system through State-Federal Judicial Councils and other means.

2. That the "exhaustion of state remedies" doctrine must be strictly adhered to in areas which have historically and traditionally been within the exclusive jurisdiction of state courts, including state bar admissions and internal administration of state court systems and in the joint jurisdiction of the federal and state authorities; otherwise, the marked improvement in state-federal judicial relationships which has occurred in recent months will be substantially eroded.

3. That various organizations interested in proper state-federal judicial relationships, including State-Federal Judicial Councils, the Federal Judicial Center, the Administrative Office of United States Courts, the National Conference of Federal Trial Judges, the Judicial Conferences of United States Courts, and the State-Federal Judicial Relations Committee of the American Bar Association, be called upon to bring to the attention of their judicial members the importance of maintaining proper and cooperative relationship between state and federal

judiciaries in the areas above delineated.

4. That Congress is called upon to enact legislation requiring the exhaustion of state judicial remedies before federal courts may entertain jurisdiction of matters which have been traditionally and historically within the exclusive jurisdiction of state court systems such as bar admissions and the internal administration of state judicial systems.