IN THE MATTER OF JOHN E. HUGHES, JR., AN ATTORNEY AT LAW.

Argued January 26, 1982—Decided June 29, 1982.

*David E. Johnson, Jr.* argued the cause for complainant Disciplinary Review Board (*Colette A. Coolbaugh,* Secretary, attorney).

*Joseph G. Dooley, Jr.,* argued the cause for respondent.

PER CURIAM.

Attorney John E. Hughes has pleaded guilty to federal criminal charges of bribing a public official and state charges of forging public documents. These extremely serious infractions demand professional discipline. At the same time, the highly unusual nature of the events surrounding these illegal acts prompts us to examine the factual circumstances with great care.

In the federal proceeding, Hughes pleaded guilty to a charge of violating 18 *U.S.C.* § 201(f). He paid $1,000 to an Internal Revenue Service agent to induce him to remain silent about possible criminal violations by Hughes. In the state proceedings, Hughes pleaded guilty to altering and falsifying records of the Essex County Register to indicate that certain federal tax liens against his parents had been released, in violation of *N.J.S.A.* 2A:136–1. He also pleaded guilty to uttering and publishing as true to the Essex County Register two false and forged Certificates of Release of Federal Tax Lien in the name of his parents, totalling more than $12,000, in violation of *N.J.S.A.* 2A:109–1.

The federal guilty plea resulted in a suspended 18 month sentence and two years probation commencing September 18, 1979. Hughes received identical sentences for each count of the state indictment to which he pleaded guilty. The state probation ran concurrent with the federal probation.

Both the federal and state matters arose from the same incidents. Hughes practiced law with his father from 1967 through February of 1976. At that time, his father pleaded guilty to failure to file and pay certain federal taxes and was suspended from the practice of law for six months. Following his father's death in November of 1976, Hughes discovered that his father had converted money from a client's estate that should have been used to pay transfer inheritance taxes. Be-

cause of this conversion, the estate owed a substantial sum to the State in unpaid taxes.

Although he had no legal duty to do so, Hughes personally paid nearly $40,000 over a period of time to the State to satisfy the estate's tax liability. His alleged motive was to avoid the adverse publicity for his family that might result from claims by the estate against the Clients' Security Fund arising from his father's misappropriation.

While still making those payments to the State, Hughes learned of certain federal tax liens on real estate then owned by his mother just as she was about to close on the sale of the property. Those liens had been imposed because his father had failed to pay certain federal taxes. Although he had no legal obligation to do so, Hughes wanted to pay off the tax liens himself. His motive was to protect his mother from knowledge of the extent of his father's wrongdoing.

Since he did not have the resources to pay off both the tax lien and the estate taxes, Hughes sought to arrange with the Internal Revenue Service for either settlement of the tax liens or a schedule of payment. When he was unable to do so, he forged the Federal Tax Lien Releases. Hughes claims that it was his intent to reinstate the liens and pay them off when he was able to do so. The result of his filing the forged releases was that any purchaser from his mother would be unaware of the lien. The purchaser, however, might someday find that the title to the property was not free and clear.

Some time later, the Internal Revenue Service sent an agent equipped with a listening device to investigate the case. The agent recorded a $1,000 bribe offer by Hughes so the agent would ignore the forged releases. Hughes subsequently paid $1,000 to the agent.

On the basis of the two criminal convictions, the District V Ethics Committee (Essex County) found that Hughes had violated DR1–102(A)(1), (3), (4), (5), (6), and DR7–102(A)(3), (4), (5), and (8). Upon a review of the full record, the Disciplinary

Review Board determined that the Committee's conclusions were supported by clear and convincing evidence.

■ We accept a criminal conviction as conclusive evidence of guilt in disciplinary proceedings. *In re Rosen,* 88 *N.J.* 1, 3 (1981); *In re Mirabelli,* 79 *N.J.* 597, 602 (1979). Although we will not retry the question of guilt, the underlying facts of the conviction are relevant to the determination of the appropriate discipline to be imposed. *In re Rosen,* 88 *N.J.* at 3.

■ Bribery of a public official and forgery of public documents are among the more serious offenses an attorney can commit. They strike at the heart of the attorney's honesty and trustworthiness as an officer of the court. Without more, these acts demonstrate unfitness to practice law. For these reasons the Disciplinary Review Board recommended that Hughes be disbarred.

■ In setting the appropriate discipline we are not interested in punishing the attorney. That is the province of the criminal law. The primary purpose of professional discipline is

> to protect the public against members of the bar who are unworthy of the trust and confidence essential to the relationship of attorney and client. [*In re Sears,* 71 *N.J.* 175, 200 (1976)]

*Accord, In re Stout,* 75 *N.J.* 321, 325 (1978). We are careful to guard the public against attorneys likely to commit dishonest acts or to betray the trust that their positions demand.

■ Because our goal is protection of the public rather than punishment of the attorney, mitigating factors are relevant to determining whether the public interest requires the ultimate sanction of disbarment. Extenuating circumstances may demonstrate that there is little or no likelihood that the attorney will repeat the transgressions. *In re Sears,* 71 *N.J.* at 199–201; *In re Stout,* 75 *N.J.* at 325; *In re Mirabelli,* 79 *N.J.* at 602. In such cases, we may sometimes achieve the public interest without having to impose the harshest sanction.

However, even if it is unlikely that the attorney will repeat the misconduct, certain acts by attorneys so impugn the integri-

ty· of the legal system that disbarment is the only appropriate means to restore public confidence in it. Bribery of a public official is surely one of those cases. It has devastating consequences to the bar, the bench, and the public, and especially the public's confidence in the legal system. No sanction short of disbarment will suffice to repair the damage.

We recognize that Hughes did not commit the acts to achieve any personal gain. On the contrary, he had no legal obligation, and perhaps even no generally accepted moral responsibility, to pay for his father's offenses. Yet he chose to undergo the hardship of paying almost $40,000 of his personal earnings to the State, rather than allowing the loss to lie on the defrauded client or the public. While the forgery allowed his mother to sell the property free of the tax liens, he received no immediate benefit from the forgery itself or the subsequent bribe. Both his diligence in paying back his father's tax obligations and his criminal acts were motivated by his desire to save his mother from the shock and embarrassment of further knowledge of his father's wrongdoing. While these facts in no way detract from the seriousness of the offenses, they do reflect a highly atypical backdrop to such criminal actions.

Human beings sometimes find it difficult to resist doing anything to help their family. We recognize the nobility of those sentiments. Yet we impose limits on what people can do in that regard. We do not applaud, for example, individuals who steal for their families. Many misappropriation cases come before this Court. In most of those cases, the respondent is not a vicious person at all but rather one who is the victim of difficult circumstances. Attorneys steal from their clients, often not to become rich, but simply to make ends meet. Would it be farfetched to imagine that they do it for the sake of their families? Perhaps they seek to prevent their families from being evicted; perhaps the funds are necessary to care for their husbands or wives or children. Yet we have not hesitated, in such cases, to disbar the attorney who steals from the client.

We do not condemn the individual who faces exigent circumstances. We do protect the public.

While mitigating circumstances might sometimes cause us to order a less drastic sanction than disbarment in a bribery case, the situation here does not warrant anything less. That the respondent ultimately paid off a lien for which he had no legal responsibility and that he paid back taxes for which he had no legal obligation are much to his credit. However, his actions did create a victim. The purchaser of his mother's home thought that the title was free and clear of any encumbrances. Yet, as a result of respondent's fraud and forgery, the purchaser actually occupied a home which had a $12,000 lien on it. While it is true that respondent ultimately paid it off out of his own pocket, it is equally true that he placed that innocent family in a position of substantial insecurity. What would have happened if respondent had not been able to pay off the lien? That innocent family might have been faced with the prospect of losing either their home or their life savings to pay off the lien. It hardly seems noble to risk the lives and fortunes of an innocent family that you have never met to prevent a member of your own family from suffering the humiliation of learning about tax evasion.

In recent years, no attorneys have been disbarred for forgery or misrepresentation to a public official when the act was committed for reasons other than personal gain. *E.g., In re McNally*, 81 *N.J.* 304 (1979); *In re Silverman*, 80 *N.J.* 489 (1979); *In re Weiner*, 56 *N.J.* 165 (1970). However, bribery of a public official has invariably resulted in disbarment. *E.g., In re Sabatino*, 65 *N.J.* 548, 549 (1974); *In re Colsey*, 63 *N.J.* 210 (1973); *In re Seaman*, 60 *N.J.* 136 (1972); *In re Goode*, 58 *N.J.* 420, 421 (1971). *Cf. In re Caruso*, 67 *N.J.* 44 (1975) (inducing client to pay money to attorney by falsely representing that money was needed to bribe a public official); *In re Abrams*, 65 *N.J.* 172 (1974) (paying an extortion demand to public officials).

We recognize that the mitigating factors in this case appear substantial. Hughes did not commit these illegal acts for personal gain. Nor did he have a duty to repay the back taxes to the State. Nevertheless, under the facts of this case, these considerations are not sufficient to overcome the presumption that attorneys who bribe public officials are a threat to the public and the legal system. Hughes not only bribed an IRS official but deliberately falsified public documents. These acts severely damage public confidence in the legal system. Moreover, a person willing to resort to such means to accomplish his goals, no matter how beneficent the goals may be, is a danger to the legal system. The combination of these two offenses compels us to conclude that the public will not be adequately protected by any disposition short of disbarment. Moreover, disbarment is the only appropriate remedy here to maintain public confidence in the bar. We so order.

We further direct Hughes to reimburse the Administrative Office of the Courts for appropriate administrative costs, including production of transcripts.

SCHREIBER, J., dissenting.

Not many years ago Justice Pashman wrote in *In re Sears*, 71 *N.J.* 175, 201–02 (1976):

> We observe finally that the judicial role in disciplinary matters demands our utmost sensitivity to the purpose which we serve. We have no great zeal to impose sanctions on individuals for disciplinary infractions. Our foremost concern is to guarantee that members of the bar represent the interests of their clients in keeping with the public trust. Thus, we must weigh the likelihood of future violations, as well as the seriousness of proven transgressions, in imposing discipline. Such judgments, by their very nature, rest on assessments of individual character. Therefore, we will not subscribe to a policy controlling future cases without knowledge of the facts which may arise in those cases. We previously stated that "each case must rest largely upon its own particular circumstances." *In re Greenberg*, 21 *N.J.* 213, 225 (1956). *See also In re Abrams*, 65 *N.J.* 172, 179 (1974); *In re Baron*, 25 *N.J.* 445, 449 (1957).

Compliance with those sentiments would not lead to the result reached this day. The Court today has created a disciplinary sanction rule calling for disbarment irrespective of the particu-

lar circumstances of the case. *See supra* at 37. Yet there is no likelihood of a future transgression by this respondent and, keeping in mind the purpose of the judicial role in disciplinary matters, I believe disbarment is not warranted.

It has often been stated, and the majority agrees, that the primary purpose of professional discipline is to protect the public from irresponsible members of the bar. If that be the essential objective, then it is necessary to determine what sanction is needed to protect the public: private reprimand, public reprimand, suspension or disbarment. We therefore look to the nature of the wrongdoing to see what remedial device is appropriate.

Our jurisdiction is derived from the constitutional provision that the "Supreme Court shall have jurisdiction over the admission to the practice of law and the discipline of persons admitted." *N.J.Const.* (1947), Art. VI, § 2, par. 3. The core of our disciplinary authority deals with the action or inaction of the individual *as an attorney*, be it with a client or the court.

Analysis of the wrongdoing in this framework may properly begin then with an examination of the extent to which the misconduct demonstrates that the attorney might potentially inflict harm on a client. When the wrongdoing is directly related to and strikes at the heart of the attorney-client relationship, such as misuse of a client's funds, the connection between the attorney's transgression and the need for future protection of the public is clear. When the wrongdoing is not directly related to that relationship, however, its effect on the practice of the law and the needed public protection in that respect is more attenuated. In those circumstances we should be, and have until now been, more sensitive to the mitigating circumstances in determining the proper discipline.

Any violation of the law creates some question about the trust and confidence that the public may reasonably be expected to repose in an attorney. No matter what the violation, some discipline may be needed to deter both the attorney involved and

other members of the bar. Violation of the law may involve such egregious conduct or be so inimical to the integrity of the judicial system that the Court should apply the extreme sanction of disbarment.

Whether disbarment is the appropriate discipline depends on both the nature of the crime and the mitigating elements. In a close case, like this one, our major concern should be to determine whether the public may in the future trust the respondent in dealings with him as a member of the bar. Is he likely to repeat the misconduct or to commit other wrongs? Is his future conduct likely to harm any clients?

The respondent's conduct here does not suggest an unethical or criminal bent. Rather, it was aberrational. Respondent sought to preserve the memory of his father's professional reputation and to protect his mother's feelings by sparing her the mortification that would follow a revelation of his father's misdeeds. Such motives are not to be equated with ordinary venality or greed. They do not suggest a common or predictable weakness in the face of temptation. Nor do they necessarily suggest a want of professional fortitude likely to manifest itself in any other situation. Furthermore, he injured no client. Hence, the essential integrity and loyalty that the profession expects of attorneys in dealings with clients are not impugned here. If anything, the integrity of the bar was enhanced by his voluntarily reimbursing his father's clients approximately $40,-000.

The Court for the first time in this case has decided that an episode involving bribery of a public official and forgery of a document, unrelated to an attorney-client matter, is an automatic cause for disbarment irrespective of mitigating factors. It does so because this act "so severely damage[s] public confidence in the legal system." *See supra* at 39. The majority draws heavily on the analogy of stealing a client's funds, the subject of *In re Wilson*, 81 *N.J.* 451 (1979), in which the Court prescribed practically a *per se* rule calling for disbarment when an attorney

misappropriates a client's funds. I submit that the Hughes' situation is not as egregious as that in *Wilson*, which involved an attorney-client relationship. Moreover, the *Wilson* rule has not been applied retroactively.

Numerous cases have been decided while I have been a member of this Court that had a much greater impact upon public confidence in the legal system and that have not resulted in disbarment. The majority has referred to three such cases. *In re Sears, supra,* involved false swearing and perjury before a grand jury, a secret $200,000 cash contribution to the Nixon campaign in return for assistance with respect to an investigation by the Securities and Exchange Commission, and improperly representing to a client that an attempt had been made to influence a judge. Justice Sullivan in his dissent summarized the situation succinctly: "To put it plainly, respondent is guilty of deliberate attempts to corrupt the processes of government." 71 *N.J.* at 204–05. Sears was suspended for three years. In *In re Stout*, 75 *N.J.* 321 (1978), a conversion of $40,000 of clients' funds for more than three years resulted in a one year suspension. In *In re Mirabelli*, 79 *N.J.* 597 (1979), the attorney pled guilty to bribing an Assistant Prosecutor to procure a non-custodial sentence for a client. There was a three year suspension.

High ethical standards for the bar are unquestionably salutary. Perhaps inexorable application of the extreme sanction of disbarment may help maintain those standards. Yet we must not forget that disbarment is a punishment and its effect can be devastating. *In re Ruffalo*, 390 *U.S.* 544, 550, 88 *S.Ct.* 1222, 1226, 20 *L.Ed.*2d 117, 122 reh. den. 391 *U.S.* 961, 88 *S.Ct.* 1833, 20 *L.Ed.*2d 874 (1968). In deciding whether to disbar, the Court should consider the whole person. Justice should be tempered with mercy. The Prophet Micah explained that human duty toward our fellow man requires us to act justly *and* to love mercy. *Micah* 6:8. I for one believe that compassion and understanding should also be brought to bear before destroying the professional life of this young attorney. He did no wrong to any client and he acted out of the highest motives for his

parents. His contrition is sincere and he poses no danger to the public. When is compassion appropriate if not here? Disbarment is too harsh. I dissent.

Justice O'HERN joins in this opinion.

*For disbarment*—Chief Justice WILENTZ and Justices PASHMAN, HANDLER and POLLOCK—4.

*Dissenting*—Justices SCHREIBER and O'HERN—2.

## ORDER

It is ORDERED that JOHN E. HUGHES, JR., of Cedar Grove be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that JOHN E. HUGHES, Jr., be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that respondent reimburse the Administrative Office of the Courts for appropriate administrative costs, including production of transcripts; and it is further

ORDERED that respondent comply with all the regulations of the Disciplinary Review Board governing suspended, disbarred or resigned attorneys.