IN THE MATTER OF ALFONSO A. TUMINI,
AN ATTORNEY-AT-LAW.

December 5, 1983.

*Robyn M. Hill* argued the cause for the Division of Ethics and Professional Services.

*Michael A. DeFino,* a member of the Pennsylvania Bar, and admitted by the Board to appear *pro hac vice* on motion of *Robert A. Gelinas,* argued the cause for respondent.

## ORDER

This matter coming before the Supreme Court on an order to show cause why ALFONSO A. TUMINI of WEST BERLIN should not be disbarred or otherwise disciplined on the basis of his disbarment in the State of Pennsylvania, and good cause appearing

It is ORDERED that the report of the Disciplinary Review Board recommending that the respondent be disbarred is hereby adopted; and it is further

ORDERED that ALFONSO A. TUMINI be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that ALFONSO A. TUMINI be and hereby is permanently restrained an enjoined from practicing law; and it is further

ORDERED that ALFONSO A. TUMINI reimburse the Administrative Office of the Courts for administrative costs, including production of transcripts.

### Decision and Recommendation of the Disciplinary Review Board

To the Honorable Chief Justice and Associate Justices of the Supreme Court of New Jersey:

This matter is before the Board based upon a motion for reciprocal discipline filed by the Division of Ethics and Professional Services following respondent's disbarment by the Supreme Court of Pennsylvania.

The Pennsylvania disbarment resulted from respondent's laundering of funds intended to bribe a public official together with his false swearing before a Federal grand jury. The Supreme Court of Pennsylvania described the pertinent transactions as follows:

"Through his activities in The Order of Brotherly Love, a fraternal organization, respondent met Anthony D. Pirillo, a formerly admitted attorney who was then president of the organization. Pirillo became Tumini's closest friend and mentor, guiding him through college and law school, and eventually hiring him to work in his law firm; first as a law clerk and later, on October, 1975, when Tumini was admitted to the bar, as an associate. In 1974 or 1975, Pirillo introduced Mr. Tumini to Augustine A. Salvitti, who was the Executive Director of Philadelphia Redevelopment Authority (hereinafter cited as "Authority") at the time. In fact, at Pirillo's request, Salvitti hired respondent to work at the Authority while Tumini concurrently was employed by Pirillo.

Respondent's association with Pirillo and Salvitti led to his being involved in illegal activities. In late 1975, respondent "laundered" checks for Salvitti which totaled approximately $10,000. The checks were drawn on the accounts of various contractors with the names of the payees left blank. Respondent cashed and delivered the money to Salvitti in such a way as to leave no record of Salvitti's receipt of the money.

Another transaction arose out of litigation between the City of Philadelphia and Penrose Industries, Inc. (hereinafter cited as "Penrose"). In December, 1973, Salvitti was appointed Executive Director of the Authority. At that time Philadelphia was involved in litigation with Penrose over a substantial piece of commercial property leased by Penrose. The Authority brought foreclosure proceedings against Penrose based upon Penrose's default on the lease. Penrose sued the Authority and the city claiming there were mitigating circumstances for the default. The Authority proposed to make a monetary payment to Penrose in order to settle the litigation and obtain clear title to the property. Salvitti told William Sylk, president of Penrose, that settlement would be facilitated if Pirillo was hired as counsel for Penrose. Once Pirillo was retained by Sylk, Salvitti and Pirillo conspired to inflate the settlement.

All money was placed in escrow and remained there from 1974 until disbursements to Pirillo in early 1976. Pirillo received $93,500.00, representing his share from the settlement. Because of adverse publicity, Pirillo and Salvitti agreed that Pirillo would declare the money as a legal fee for federal income tax purposes, pay the taxes on it, and thereafter evenly divide the remainder with Salvitti. On March 30 and May 7, 1976, Tumini, at Pirillo's request, delivered cash payments of $15,000 and $12,500 to Salvitti. Respondent admitted knowing that the payment constituted a bribe of a public official.

The Penrose transaction became the subject of a federal grand jury investigation for which respondent was subpoenaed. After invoking his privilege against self-incrimination, Tumini was granted immunity from prosecution by the United States District Court. At Pirillo's request, respondent gave perjured testimony in which he denied knowledge of the fee-splitting arrangement between Pirillo and Salvitti, and of the March 30 and May 7 deliveries of cash to Salvitti. Afterward, respondent learned that Sylk, who had also given perjured testimony, had recanted his previous testimony and told the truth about the Penrose transaction. Under threat of prosecution for perjury, respondent recanted his own perjured testimony and cooperated with the grand jury investigation and the federal government's subsequent prosecution of Salvitti.

Salvitti was convicted and sentenced to serve three years in a federal penal institution and to pay a fine of $38,000. Pirillo, who also testified against Salvitti as an immunized government witness, was disbarred on consent by order of this Court dated June 7, 1978."

The Pennsylvania Court concluded that the respondent's laundering and delivery of payments while knowing that at least one of these payments was a bribe of a public official, together with his false swearing and failure to cooperate while an immunized witness in criminal proceeding and failure to recant until faced with possible prosecution for perjury, required his disbarment. The Court discounted respondent's claim that a sanction less than disbarment should be imposed since he was faced with choosing between loyalty to his friends and compliance with the

law and Disciplinary Rules. The Court further noted that, contrary to his assertions, the respondent benefited financially and professionally from his misconduct, and could not utilize the defenses of youth and inexperience since he was "knowledgable and sophisticated about Philadelphia politics and aspects of the criminal court system."

The Division of Ethics and Professional Services motion for reciprocal discipline was originally scheduled to be heard by the Board in January of 1983. In light of a Motion for Reconsideration filed by respondent which was then pending with the Pennsylvania Supreme Court, and following respondent's consent to temporary suspension, that hearing was adjourned without date. On March 28, 1983, the motion for reconsideration was denied, and the reciprocal discipline motion was rescheduled.

## CONCLUSION AND RECOMMENDATION

The Disciplinary Review Board adopts the findings of the Pennsylvania Court in accordance with the direction of the New Jersey Supreme Court in *In re Kaufman,* 81 *N.J.* 300 (1979). At hearing before the Board, the respondent did not dispute the factual findings of the Pennsylvania Court with regard to the improprieties found to exist. Respondent did contend, however, that the Court was incorrect in its conclusions as to respondent's political sophistication and personal benefit from his improper activities. In light of the particular findings of misconduct by the respondent, the Board does not find resolution of either matter to be necessary in order to reach a decision.

The respondent does not dispute that he was knowingly involved in the laundering of funds, and that the purpose of at least one of the payments was to bribe a public official. Similarly, he does not dispute the finding that he committed perjury before a federal grand jury *at the request* of Pirillo. As justification, he states that his actions were motivated by loyalty to his friends, and that this loyalty prevailed over integrity.

22

Disbarment in Pennsylvania is not an absolute bar to reinstatement to the practice of law: a disbarred attorney may apply for reinstatement five years and one month after the effective date of disbarment. *See* P.R.D.E. Rule 218(b) and (b)3(i). In New Jersey, reinstatement following an Order of disbarment is not contemplated by court rules. "... (U)nless good reason to the contrary is shown, the discipline accorded in New Jersey will ordinarily correspond with that imposed in the other jurisdiction" *In re Kaufman,* 81 *N.J.* 300 (1979). In the case at hand, however, each of the offenses of laundering funds to bribe a public official or committing perjury would individually merit disbarment in New Jersey. *See In re Colsey,* 63 *N.J.* 210 (1973), where an attorney was disbarred for his involvement as a conduit for monies used to bribe public officials; and *In re Foster,* 60 *N.J.* 134 (1972), where an attorney was disbarred for perjury in his testimony before a county grand jury and in a subsequent criminal trial, even though he later recanted. The combination of the offenses of perjury and laundering funds mandates disbarment in this state.

The Board therefore recommends that the respondent be disbarred, without any possibility of reinstatement.

The Board further recommends that the respondent be required to reimburse the Administrative Office of the Courts for administrative costs, including production of transcripts.

DISCIPLINARY REVIEW BOARD

By: /s/  A. Arthur Davis, 3rd
A. Arthur Davis, 3rd,
Chairman

DATED: June 28, 1983