## IN THE MATTER OF JAMES J. CALLAHAN, AN ATTORNEY AT LAW.

Argued December 2, 1975—Decided May 11, 1976.

*Mr. John Lee Madden* argued the cause for the Burlington County Ethics Committee.

*Mr. Francis J. Hartman* argued the cause for respondent (*Messrs. Hartman, Schlesinger, Schlosser & Faxon,* attorneys).

PER CURIAM. This disciplinary proceeding against respondent, a member of the bar of this State, grows out of an investigation by the Ocean County Prosecutor's office of official corruption in Jackson Township of which respondent was Township Attorney during 1969 and 1970. As a result of the investigation, respondent and several others were indicted on various charges of conspiracy, bribery and corruption arising out of Township approval of an application for a trailer park license. A separate indictment was also returned against respondent charging him with soliciting a bribe, misconduct in office and conspiracy to bribe involving a senior citizens garden apartment in the Township. Respondent was tried separately on each indictment and ultimately acquitted of the charges by jury verdict. Thereafter, at the direction of this Court, respondent's conduct as an attorney in these same matters was investigated by the Burlington County Ethics Committee, which filed a statement of charges in two counts.[1]

The first count alleged that respondent, while Township Attorney, worked against his own client's interests and conspired with two individuals to bribe public officials in Jackson Township to remove an age restriction on occupancy of an 18 to 20 unit senior citizens garden apartment owned by Doral Construction Company. A summary of the factual background of this matter is set forth in this Court's opinion in *In re Sabatino,* 65 *N. J.* 548 (1974).

The owners of the garden apartment had attempted to comply with the restriction which limited occupancy to persons over 62 years of age, but were plagued by substantial

---

[1] The matter was not heard by the Ocean County Ethics Committee because of personal relationships between members of that Committee and respondent.

vacancies with resultant serious financial problems. Consequently, they began to rent to persons without regard to age. Efforts were then made to have the age restriction lifted, but the Township took no action on these applications. The owners also were confronted with a suit brought by the municipality to enforce the restriction.

Frank Vogel, who had been one of the principals of Doral, suggested that the most expeditious way to have the restriction lifted was to bribe certain Township officials. He called upon Murray Eisdorfer, another principal of Doral, to furnish $9,000 which was to be used largely for that purpose.[2] Eisdorfer, however, reported the matter to the prosecutor's office and implicated Vogel and one Arthur Sabatino, who was then a New Jersey attorney representing Vogel. As a result, the prosecutor's office, with Eisdorfer's cooperation, made recordings of telephone conversations which Eisdorfer had with Vogel and Sabatino and of a personal conversation between Eisdorfer and Sabatino.[3]

When Vogel and Sabatino were confronted with the incriminating evidence against them they agreed to assist the prosecutor's office which was trying to reach the public officials involved. It was through their cooperation that recordings of conversations were made which directly implicated respondent in the case.

The transcripts of these conversations demonstrate that a conspiracy to bribe public officials existed, that respondent knew of the plan and discussed terms and ramifications of the bribe or attempted bribe with Vogel and Sabatino.

On one occasion, May 15, 1970, Vogel and Sabatino went to respondent's office with $4,000 in marked money and tendered it to him on the basis that it would "take care

---

[2]According to Vogel, Eisdorfer had previously taken $9,000 of Doral funds for his own use.

[3]These recordings subsequently formed the basis of disciplinary proceedings against Arthur Sabatino resulting in his disbarment. See *In re Sabatino, supra.*

of everything." Respondent refused the money saying he had originally figured "I could get it for a thousand dollars a vote. I can't guarantee that now * * *," adding that the members of the Board of Adjustment were suspicious and that if he walked in with four thousand dollars they would think he "got ten." He suggested that the Chairman of the Board of Adjustment be approached directly.

At a subsequent meeting between the same parties held in respondent's office on June 16, 1970, a discussion was had about how to get the Board of Adjustment to recommend that the senior citizen restriction be lifted. In answer to an inquiry from Sabatino as to whether each member would have to be paid individually, respondent answered "no" and he gave the name of an individual who he said would be the "bag man" for the Board of Adjustment and probably also for the Township Committee.

Respondent also said that at least three members of the Board would have to be paid and suggested a thousand dollars "for each vote." However, with regard to the Township Committee, which would have to approve the Board's recommendation, respondent said three councilmen would have to be paid and he did not think "you'll get by" for a thousand apiece; that it was "usually a thousand dollars a unit they go, that's for the entire package." (The project contained 18 to 20 units.) When Sabatino expressed amazement at the figure, respondent merely said "It's a big business Art."

Respondent concedes, as indeed he must, that the transcripts indicate the proposed bribery of Jackson Township public officials. His explanation is that he did not want to appear to be a "goody goody," nor did he want to hurt the feelings of Vogel and Sabatino by refusing to indicate his participation. Accordingly, he just strung them along with talk but "I never went along" and never intended to be a party to an actual bribery.

This explanation is incredible. If words mean anything, respondent's recorded conversation plainly implicates him in the proposed bribery. Even were we to give some credence

to respondent's story, which we do not, his failure as Township Attorney to report an ongoing plan to bribe Township officials to the appropriate authorities constituted a gross violation of his ethical responsibility. The Ethics Committee's finding that respondent's conduct was a violation of the then Canons of Professional Ethics, Articles 15, 16, 29, 32 and 44, is supported by clear and convincing evidence.

The second count of the statement of charges heard by the Ethics Committee set forth that respondent, while Jackson Township Attorney, knowingly participated in an illegal plan whereby one Clarence Sprinkle paid $5,000 in return for a favorable vote from Committeeman "X" approving an application for a trailer park license in Jackson Township. In particular, respondent was charged with having received the $5,000 for his friend and client Committeeman "X", knowing the money was a bribe.

The record shows that Sprinkle, who was a former Township Committeeman, had entered into an agreement with the principals of the proposed trailer park, which was to be located in Jackson Township, in which he was to help obtain approval of the pending application for a trailer park license. In return, he would be awarded the park building contract on a cost-plus basis (he testified that this is where the "real money" was) and was to receive a $35,000 cash payment. It was understood that the $35,000 was to be used to the extent necessary to buy votes. Sprinkle received the money in several installments, one of which, $20,000, was paid by one of the principals of the trailer park on May 5, 1970, the day after the application had been approved by the Township Committee.

The involvement of Committeeman "X" stemmed from his serious financial problems which were climaxed by the entry of a judgment, the sequestration of assets and the prospect of civil arrest. "X" had approached Sprinkle and asked to borrow $5,000 from him. The two met in respondent's office where respondent explained the nature and gravity of "X's" financial problem.

At the same meeting, Sprinkle agreed to give "X" the money if the trailer park application was approved. However, Sprinkle said that this part of the arrangement was not made in the presence of respondent and respondent testified that, as far as he understood, the $5,000 payment was to be a bona fide loan from Sprinkle to Committeeman "X."

The application for the trailer park was approved by the Township Committee on May 4, 1970 by a two-to-one vote with Committeeman "X" voting in favor of the application. Respondent was present at this meeting. The next day, by arrangement, Sprinkle met with respondent and "X" in a diner and delivered a $5,000 check payable to respondent. This was a part of the $20,000 which Sprinkle had received that morning from one of the principals of the trailer park. Respondent and "X" then went to the creditor's attorney and satisfied the judgment, using respondent's check on his escrow account.[4] Upon returning to his office respondent deposited the check he had received from Sprinkle in his escrow account.

Respondent testified that he did not learn that the "loan" to "X" was actually a bribe until three years later. Yet in the transcript of the May 15, 1970 office conversation between respondent, Vogel and Sabatino, concerning the removal of the age restriction on the senior citizens garden apartment, respondent mentioned that "X" "got five thousand dollars for voting yes" in a matter that passed by a two-to-one vote.[5]

Respondent concedes that he was referring to the May 4, 1970 trailer park vote in this comment. When asked to

---

[4]Satisfaction of the judgment required $8,055.35. The difference between this amount and the $5,000 had been furnished that morning by "X" to respondent's office and deposited in respondent's escrow account.

[5]This comment by respondent in the May 15, 1970 transcript alerted the prosecutor's office to a possible bribe other than the one they were then investigating, and ultimately led it to the trailer park application and vote.

explain it, he said that, after the vote, he had heard remarks by people who attended the meeting made in "a kidding fashion" that some chicanery had taken place with regard to this vote. It seemed to him, at the time, advantageous "to use this as an antidote to explain to Vogel and Sabatino that bribery is not the course of action that should be taken." He said the $5,000 figure just "popped" into his head.

This explanation simply does not make any sense. To put it plainly, it is pure gibberish. The above mentioned excerpt from the May 15, 1970 transcript demonstrates that ten days after the $5,000 had been paid by Sprinkle, respondent referred to it as a payment for a vote.

Aside from the foregoing, respondent's admitted knowledge that Sprinkle was a "wheeler-dealer," the sequence of events, the timing of the $5,000 payment and the fact that the check was signed by a principal of the mobile home project, all point clearly and convincingly to respondent's knowledge of and participation in the corrupt venture.

There is much more evidence in the record clearly and convincingly linking respondent to the bribery and corruption heretofore set forth. Suffice it to say we find that respondent's attempted explanation of his conduct (including his taped conversations) given at length before the Ethics Committee is patently unbelievable.

We recognize that respondent was acquitted of criminal charges based on substantially the same conduct involved in the Ethics Committee Presentment. However, such acquittal is not *res judicata* in a disciplinary proceeding. *In re Pennica,* 36 *N. J.* 401, 418 (1972). Respondent does not question this proposition.

The extent of discipline to be imposed is mandated by *In re Sabatino, supra,* and *In re Colsey,* 63 *N. J.* 210 (1973). See also, *In re Hyett,* 61 *N. J.* 518 (1972). We have heretofore referred to the bribery of public officials as a blight that destroys the very fabric of government. There are no extenuating circumstances. Respondent has demonstrated his

unfitness to practice law. His name is hereby stricken from the rolls.

*For disbarment*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—7.

*Opposed*—None.