621 A.2d 469
IN THE MATTER OF RODNEY B. JONES,
AN ATTORNEY AT LAW.

Argued February 2, 1993—Decided March 26, 1993.

*Richard J. Engelhardt,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Jerrold Kamensky* argued the cause for respondent (*Kamensky,* attorney; *Ellis H. Davison, II,* of counsel and on the brief).

PER CURIAM.

This disciplinary proceeding arose from a Motion for Final Discipline Based Upon a Criminal Conviction filed by the Office of Attorney Ethics (OAE) before the Disciplinary Review Board (DRB), seeking disbarment of Rodney B. Jones, pursuant to *Rule* 1:20-6(c)(2)(i). That motion was based on respondent's plea of guilty to the solicitation of a gift while a deputy attorney general in violation of *N.J.S.A.* 2C:27-6a.

The DRB recommended by a vote of 4-2 that respondent be disbarred. The DRB disagreed not on the severity of respondent's transgression but on the severity of the discipline. Two members would have imposed a three-year suspension. One of

the dissenting members was not persuaded "that respondent's conduct clearly and conclusively demonstrates that 'his ethical deficiencies are intractable and irremediable' *In re Templeton,* 99 *N.J.* 365, 374 [492 *A.*2d 1001] (1985), such that disbarment [was] the only appropriate discipline." Two members did not participate. Our independent review of the record leads us to accept the DRB's recommendation.

I

Respondent was admitted to the New Jersey bar in 1986. At the time of his offense, he was a Deputy Attorney General assigned to the Department of Transportation. His criminal offense, however, was related to his prior assignment as counsel to the Professional Boards, including the New Jersey Board of Psychological Examiners.

While respondent was serving as counsel to the Professional Boards in early 1990 he encountered Dr. Alvin Olesh, the person from whom he solicited a payment. Dr. Olesh had filed a complaint against Dr. Clairfield, a psychologist, seeking revocation of that doctor's license to practice psychology. Respondent, as counsel to the Board, had asked Dr. Olesh for further information about his complaint. Prior to October 2, 1990, respondent had met Dr. Olesh only twice.

In May 1990, *after* respondent had been reassigned to represent the Board of Transportation, he first communicated with Dr. Olesh. At that time respondent was under severe emotional and financial stress. In January 1990, his father, with whom he had been very close, died, leaving debts of $80,000. Respondent and his mother both feared that those debts would force his mother to lose her home. In May 1990, his car was stolen in Newark and the insurance company would reimburse him only to the extent of $1,000 for his car. In 1989 he had been discharged from personal bankruptcy, and thus he was unable to borrow from more conventional sources.

All of respondent's conversations with Dr. Olesh were tape-recorded. Both the DRB and respondent rely on the affidavit of Detective Sergeant Landsky of the New Jersey State Police, who was assigned to investigate respondent's alleged bribe of Dr. Olesh, to establish the basic facts of respondent's contacts with Dr. Olesh. Those facts are summarized in Detective Sergeant Landsky's affidavit, as follows:

*May 20, 1990*

7. ... During the conversation ... Jones advised [Dr. Olesh] that he was having financial problems and needed assistance. Jones advised Dr. Olesh that he needed either $1,500 or an automobile. Dr. Olesh asked Jones what he could do for him in return. Jones advised Dr. Olesh that he was now with the Department of Transportation and no longer assigned to the Professional Boards. He said that, while he no longer had any direct or indirect participation in the matter pending before the Board, he could keep Dr. Olesh posted with respect to the progress of the case. Additionally, Jones indicated that he would be willing to speak to members of the Psychological Board with respect to the case but did not believe that he would be in a position to influence the Deputy Attorney General handling the matter. Dr. Olesh then asked how and when DAG Jones planned to repay the loan if it was provided. Jones indicated that he did not, in fact, plan on repaying the loan but, rather, would work it off by doing legal work. Jones did state to Dr. Olesh that he could possibly expedite the matter through the Professional Board.

Respondent and Dr. Olesh had no further communication until August 1990. At that time, respondent, who had anticipated receiving $5,000 from the insurance company for his stolen automobile, was informed by the insurance company that it would pay him only $1,000 for his stolen car. The Office of the Attorney General refused respondent's request to allow him to sue the insurance company. The day after the Office of the Attorney General told him that he could not sue the insurance company, he attempted to communicate with Dr. Olesh. Apparently, he did not speak to Dr. Olesh until September 29, 1990. The details of that conversation are as follows:

*September 29, 1990*

9. * * * During their conversation, Rodney Jones told Olesh that he was in a new position and he did not want to put himself in a situation where he could be fired from the office by doing anything unethical. He could only provide Olesh with information that he knows about; information that is public. He specifically told Dr. Olesh, "I could never provide you with confidential information. I could never undermine or have any input and/or influence the Board in any

manner." He further indicated that even if he could he wouldn't because "my license and career are too important." Dr. Olesh and Jones proceeded to discuss the pending complaint against Dr. Clairfield. Jones indicated that he didn't believe the Board was going to revoke Clairfield's license. He informed Olesh that he keeps in touch with the Board members, with whom he had developed a friendship. At one point, Jones told Olesh that if he were to tell Olesh about any complaints before the Board that had not been made public, then he would have a "major problem." He further explained "I would be obtaining information that you are not entitled to ... by naming people. The only way I can get that information is by going to the Board office and looking through the file, which I have access to because I am a Deputy. But believe me they would fry my ass."

10. * * * Jones also indicated that he is now going to pay Olesh back and wants to sign a Promissory Note memorializing the loan. Jones requests $2,500 from Olesh, which would put him back on his feet. He tells Olesh that he expects a raise in December and that he anticipates that the Attorney General's Office will approve that raise....

11. During the conversation, Dr. Olesh reminded Jones that in his first telephone call, of May 20, 1990, he indicated that he wasn't going to pay the money back and would do legal work for Olesh. Jones responded "I want to legitimize ... alright ... I don't want you to just give me money and ... lets say anything happens, lets say you weren't satisfied with what the Board did; and somehow you get angry and you slipped down and you told the (Attorney General) that you gave this guy money to give you the information. Further in the conversation, Jones indicates that the $2,500 is not a lot of money. Certainly he indicates it is not enough to lose his job or career over. He admonished Olesh to be sensitive about his position. Olesh asked Jones what Jones could get him by way of information. Jones inquires as to what kind of information. Jones asks Olesh if he would still give him the $2,500 if he did not get any information in return. After making that statement he advises Olesh that he only said that because he knew Olesh was recording the conversation.

## Respondent and Dr. Olesh had further telephone conversations on September 30, 1990, and October 1, 1990.

*September 30, 1990*

12. * * * Jones again placed a telephone call to Dr. Olesh's residence. After discussing the Clairfield and Cooper situations, Olesh reminded Jones that he kept asking Olesh what he wanted in return for the money. Olesh told Jones that the answer is he wants Clairfield's license revoked. Jones responded that he was not in a position to do that. He could not control the situation. At which point, Olesh offers Jones more money. Jones responded that all he wanted was enough money because he was in a [sic] "honest bind."

13. Jones proceeded to advise Olesh that if he were still with the Board of Psychological Examiners, he wouldn't even have approached him for the loan at this stage in his career. It would be unethical. He again advised Olesh that he had no direct influence. Jones stated "I can keep you informed because I have made friendships with the Board members and the director." He also stated,

referring to members of the Board: "They're not going to tell me anything I'm not entitled to know, but what I am entitled to know, if you don't have access to them, I'll be happy to discuss with you." This conversation ended when Jones asked Dr. Olesh to call him back.

*October 1, 1990*

15. * * * [Respondent] also told Olesh that he had good news. He indicated that he had spoken to a friend, who indicated that she would be willing to sign a promissory note reflecting that Olesh had lent her money, which she would repay in a lump sum. This method, according to Jones, would hide his identity as the individual who is ultimately to receive the money. Jones stated "what that does for me is opens up my ability to help you more." Jones indicated, however, that this individual was currently in need of a [sic] approximately $1,500. Jones stated that he had advised her that he would ask Olesh for $5,000. During this conversation, Jones indicated to Olesh that "I won't talk to you about that over the phone, but now it frees me up to do more because there is nothing in my name." Jones went on to indicate that this other individual, whom he trusted, was Anne Haynes, Esq. This conversation concluded with Jones asking Olesh to bring a copy of the interim order entered by the Board of Psychological Examiners against Clairfield with him when he meets Jones on October 2, 1990. Additionally, Jones and Olesh discussed the filing of certain major medical claim forms, which would entitle Olesh to a reimbursement of some portion of the medical fees he paid out while he and his wife were receiving counseling. (These claim forms are currently in the Board's file.) Jones indicates "that we can work on right now." When Olesh pushes Jones with respect to Clairfield's license, Jones again indicates "I'll talk to you in person...."

On October 2, 1990, at 1:00 p.m., respondent met with Dr. Olesh in Newark.

*October 2, 1990—1:00 p.m. meeting.*

16. During this meeting, which was recorded, Jones stated to Olesh, if you want to make it into a loan, Anne will pay you back in 60 days ... the only thing I'm going to do for you, I'm going to give you information ... basic information and let you know what's going on * * * You want to make it a retainer, I'll itemize everything for you. I will see to it that things change cause things are not going your way right now." Olesh asked what Jones can do to make things change. Jones responded, "I can make contacts with the Board, with the Director ... I can see ... that I'll try to get your money back from the insurance." Olesh asked about the claim forms to which Jones stated, "We'll get 'em paid." He also advised Olesh that he can counsel him on how to deal with the Board of Psychological Examiners.

\*     \*     \*     \*     \*     \*     \*     \*

18. Jones also discussed the method in which Olesh is to be billed for Jones' work. Any bill Olesh would receive would be on Haynes' stationary. As Jones put it I'll "keep you informed, any contact with the Board, I'll bill you for; any

contact with you, I'll bill you for. I can't bill you myself; that's why I need Anne. I got to bill you through her."

19. As to the claim forms, Jones indicated that he will see that they are processed. * * *

At the conclusion of that meeting, respondent indicated that he was upset because Dr. Olesh had not brought any money. At 3:30 p.m., that same day, respondent and Dr. Olesh met again. At that meeting Anne Haynes was also present.

*October 2, 1990—3:30 p.m. meeting.*

21. * * * Jones indicated that he needed the money then or he will lose his apartment. He further stated "I am in constant communication with some members of the Board and they keep me informed ... If, they find out that, in any way, I'm involved with you, or been retained by you, whether directly or indirectly, it's going to destroy that relationship as it will destroy any opportunity for me to help you." At this point in the meeting, Dr. Olesh counted out $1,000 in cash, which was turned over to Rodney Jones. When the meeting ended, Jones followed Olesh to his automobile. He asked Olesh if he was wearing a recording device. He stated, "If you are recording this, it doesn't help our cause."

On October 4th, respondent again met Dr. Olesh. At that time Dr. Olesh gave respondent $4,000—$2,500 to respondent and $1,500 to be given to Ms. Haynes.

On March 15, 1991, the Office of the Attorney General filed the following Accusation against respondent:

[B]etween on or about May 20, 1990, and on or about October 4, 1990, * * * the said RODNEY B. JONES, who at all times relevant to this accusation was employed as a Deputy Attorney General by the New Jersey Department of Law and Public Safety, Division of Law, knowingly did solicit, accept and agree to accept a benefit not allowed by law, that is, United States currency with a value of $5,000, from another to influence the performance of his duties with respect to a matter pending before the New Jersey Board of Psychological Examiners by engaging them in conversation with respect to the said complaint, to influence the processing and release of certain major medical claim forms and to keep another apprised of the progress of the said complaint, all contrary to the provisions of *N.J.S.A.* 2C:27–6a, and against the peace of this State, the government and dignity of the same.

On March 15, 1991, respondent pleaded guilty to the third-degree crime of solicitation of a gift while a public servant, in violation of *N.J.S.A.* 2C:27–6a. That statute provides: "A public servant commits a crime if he, knowingly and under color his office, directly or indirectly solicits, accepts or agrees to

accept any benefit not allowed by law to influence the performance of his official duties."

On April 19, 1991, respondent was sentenced to a period of probation for three years, ordered to perform ten hours of community service per month, fined $2,500, and ordered to provide restitution of $1,000 to the State. Additionally under *N.J.S.A.* 2C:51–2c, respondent's conviction forever bars him from future government employment.

On March 18, 1991, the Supreme Court temporarily suspended respondent from the practice of law. That suspension remains in effect. On February 27, 1992, respondent was arrested for possession of a controlled dangerous substance. Respondent informed the Court that as of March 5, 1992, he was enrolled in a drug rehabilitation program at Mountainside Hospital, in Montclair, New Jersey.

## II

A criminal conviction of an attorney is conclusive evidence of guilt in a disciplinary proceeding. *R.* 1:20–6(c)(1). The sole issue to be determined is the extent of discipline to be imposed. *R.* 1–20–6(c)(2)(ii); *In re Lunetta,* 118 *N.J.* 443, 445, 572 *A.*2d 586 (1989); *In re Goldberg,* 105 *N.J.* 278, 280, 520 *A.*2d 1147 (1987); *In re Tuso,* 104 *N.J.* 59, 61, 514 *A.*2d 1311 (1986). In determining appropriate discipline, we consider the interests of the public, the bar, and the respondent. *In re Litwin,* 104 *N.J.* 362, 365, 517 *A.*2d 378 (1986); *In re Mischlich,* 60 *N.J.* 590, 593, 292 *A.*2d 23 (1977). The appropriate discipline depends on many factors, including the "nature and severity of the crime, whether the crime is related to the practice of law, and any mitigating factors such as respondent's reputation, his prior trustworthy conduct, and general good conduct." *In re Lunetta, supra,* 118 *N.J.* at 445, 446, 572 *A.*2d 586; *In re Kushner,* 101 *N.J.* 397, 400–01, 502 *A.*2d 32 (1986). Although we do not make an independent examination of the underlying facts to ascertain guilt, we do consider them relevant to the

nature and extent of discipline to be imposed. *In re Goldberg, supra,* 105 *N.J.* at 280, 520 *A.*2d 1147; *In re Rosen,* 88 *N.J.* 1, 438 *A.*2d 316 (1981).

### III

Our independent review of the record leads us to conclude that respondent has violated *RPC* 8.4(b) (by committing a criminal act that reflects adversely on his honesty, trustworthiness, or fitness as a lawyer); *RPC* 8.4(c) (by engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); and *RPC* 8.4(d) (by engaging in conduct that is prejudicial to the administration of justice).

We can reach no other conclusion. Respondent essentially devised a scheme to bribe a public servant, himself. "Few crimes other than bribery of a public official so tellingly demonstrate an attorney's lack of honesty, respect for law, and trustworthiness as an officer of the courts." *In re Tuso, supra,* 104 *N.J.* at 64, 514 *A.*2d 1311. In *Tuso* we disbarred an attorney convicted of bribing a school board member.

Bribery of a public official "is a blight that destroys the very fabric of government," *In re Callahan,* 70 *N.J.* 178, 184, 358 *A.*2d 469 (1976). We equate "the crime itself [ ] with unfitness to practice law." *In re Tuso, supra,* 104 *N.J.* at 65, 514 *A.*2d 1311. Indeed, even when the offender did not act for personal greed or financial gain, and the mitigating factors were substantial, we found that the only appropriate discipline for bribery of a public official was disbarment. *In re Hughes,* 90 *N.J.* 32, 446 *A.*2d 1208 (1982). In *Hughes* we found that

> certain acts by attorneys so impugn the integrity of the legal system that disbarment is the only appropriate means to restore public confidence in it. Bribery of a public official is surely one of those cases. It has devastating consequences to the bar, the bench, and the public, and especially the public's confidence in the legal system.

[*Id.* at 37, 446 *A.*2d 1208.]

Invariably, bribery of a public official has resulted in disbarment. *Id.* at 38, 446 *A.*2d 1208; see *In re Rigolosi,* 107 *N.J.*

192, 526 *A*.2d 670 (1987); *In re Conway,* 107 *N.J.* 168, 526 *A*.2d 658 (1987); *In re Sabatino,* 65 *N.J.* 548, 549, 324 *A*.2d 20 (1974); *In re Colsey,* 63 *N.J.* 210, 306 *A*.2d 72 (1973); *In re Hyett,* 61 *N.J.* 518, 296 *A*.2d 306 (1977); *In re Goode,* 58 *N.J.* 420, 278 *A*.2d 206 (1971). All attorneys in the aforementioned cases were disbarred because of their participation in a bribery conspiracy that directly subverted the administration of justice. Cf. *In re Mirabelli,* 79 *N.J.* 597, 401 *A*.2d 1090 (1979); *In re Caruso,* 67 *N.J.* 44, 335 *A*.2d 10 (1975) (holding disbarment required for inducing client to pay money to attorney by falsely representing that money was going to bribe public official).

None of the above cases concerned a public official who had explicitly solicited a bribe. Respondent engaged in a crime of dishonesty that directly involves the practice of law and the administration of justice. Indeed, only his position as attorney within the Division of Law enabled him to solicit the money. His conduct violated his duty as an attorney and as a public official. He solicited the bribe solely for his personal financial gain, and his misconduct did not constitute only one act but several acts over a five month period.

Although respondent alleges that his emotional distress and desperate need for money to replace his stolen car and to help his mother drove him to commit those acts, the facts indicate that he did not use the money for those purposes. Instead, he apparently used the first $1,000 he received as a security deposit on his apartment. Of course, he did not have the opportunity to use the $4,000 that he later received. We do know, however, that he asked Dr. Olesh to give him $2,500 and Ms. Haynes $1,500.

In his affidavit of March 5, 1992, respondent stated that he asked Dr. Olesh for an additional $2,500 to help Ms. Haynes with her financial difficulties. Respondent had previously lived with Ms. Haynes for three years, and he alleges that his bankruptcy in 1988 arose primarily from his attempts to support Ms. Haynes and her three children. Although not living

with Ms. Haynes at the time of his offense, he was still close to her.

The dissent in the DRB points to respondent's emotional distress and financial needs as mitigating factors that call for a lesser sanction. We disagree. Like the DRB, we do not feel that either his financial needs or emotional stress were mitigating factors sufficient to affect the severity of respondent's discipline. We likewise find the psychiatric condition reflected in the report submitted by respondent to be causally unconnected to his misconduct.

The DRB dissenter also alleges that this case is distinct from and does not really represent a "poisoning of the well" by a perversion of the adjudicative process. The dissent notes that respondent was no longer working on Dr. Olesh's complaint or indeed even working for the Professional Boards when he communicated with Dr. Olesh. His duties were with the Department of Transportation. Hence, he had no official duties in connection with Dr. Olesh's complaint. Moreover, Dr. Olesh was not the target of an investigation by the Board of Psychological Examiners, but was instead a complainant. The dissenter concluded that "respondent apparently could not have influenced or corrupted the adjudicative process in any meaningful way by what he discussed with Dr. Olesh." One cannot, however, read respondent's conversations with Dr. Olesh without recognizing that respondent was very aware that what he was doing was unethical and clearly was in violation of his position as a deputy attorney general.

We recognize that respondent was a young (thirty-one years old) and a relatively inexperienced attorney (four years at the bar) when the critical events occurred. He has also demonstrated remorse for his conduct. Like the dissenter in the DRB we are also moved by the strong letter of love written by respondent's mother and the letters of support from several members of the community in which he had lived.

■ That respondent, who had a promising career, until this infraction, is to be disbarred is tragic. Nonetheless, respondent committed a serious crime. He solicited a bribe while a public official. Moreover, he committed the crime for his personal gain. His conduct seriously damaged the public's confidence in the Office of the Attorney General, the chief law-enforcement agency in the State. His offense, committed not only as a lawyer but as a public official, impugned "the integrity of the legal system." *In re Hughes, supra,* 90 *N.J.* at 36, 446 *A.2d* 1208.

We conclude that respondent's criminal misconduct warrants disbarment.

Respondent is directed to reimburse the Ethics Financial Committee for appropriate administrative costs.

So ordered.

*For disbarment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—none.

## ORDER

It is ORDERED that RODNEY B. JONES of TEANECK, who was admitted to the bar of this State in 1986, and who was thereafter temporarily suspended from the practice of law on March 18, 1991, and who remains suspended at this time, be disbarred and his name stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that RODNEY B. JONES be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that RODNEY B. JONES comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with disbarred attorneys; and it is further

ORDERED that RODNEY B. JONES reimburse the Ethics Financial Committee for appropriate administrative costs.