SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**In the Matter of Peter J. Cammarano, III, An Attorney at Law (D-46-13) (073714)**

**Argued April 9, 2014 -- Decided September 17, 2014**

**ALBIN, J., writing for a unanimous Court.**

In this attorney disciplinary matter, the Court considers the appropriate level of discipline for respondent Peter J. Cammarano, III, who, as a consequence of misconduct occurring during his campaign for, and brief term as, Mayor of Hoboken, pled guilty to one count of conspiracy to obstruct interstate commerce by extortion under color of official right.

Respondent was admitted to practice in New Jersey in 2002 and was never professionally disciplined prior to the conduct giving rise to this matter. In 2009, respondent ran for Mayor of Hoboken. In late April and early May 2009, during the mayoral campaign, respondent and two of his political operatives twice met at a Hoboken diner with a cooperating government witness, Solomon Dwek. Dwek, posing as a real-estate developer in need of zoning approvals for future projects, offered to make illegal campaign contributions in exchange for preferential treatment. Respondent assured Dwek that he would keep his contributions confidential and would "be there" to expedite the processes associated with Dwek's development plans. In exchange, Dwek provided one of respondent's operatives with a total of $10,000 in cash.

The May 13, 2009, election resulted in a run-off between respondent and the other highest vote-getter. A few days later, Dwek met for a third time with respondent, the two operatives, and another associate of respondent's. Dwek promised another $5000 and respondent reiterated his earlier assurances regarding the confidentiality of the contributions and the promised preferential treatment. Respondent assured Dwek that, in contrast to people who were against respondent, Dwek would have his support.

On June 9, 2009, respondent won the run-off election. On June 23, 2009, respondent and his operatives met with Dwek for a fourth time, informing him that the campaign ran a $19,000 deficit. Dwek offered respondent $10,000, and respondent assured him that they would "be friends for a good long time." On July 16, 2009, Dwek, respondent, his two operatives, and his associate met for the last time. Dwek discussed some of his development ideas, and respondent indicated that Dwek had his wholehearted support. Dwek gave respondent's associate $10,000 in cash and promised another $10,000 the following week. In total, respondent accepted $25,000 from Dwek, with the understanding that Dwek had purchased the right to preferential treatment in land-development matters in Hoboken. Shortly thereafter, federal authorities arrested respondent and he resigned as mayor.

On April 20, 2010, respondent pled guilty in United States District Court for the District of New Jersey to one count of conspiracy to obstruct interstate commerce by extortion under color of official right, in violation of 18 U.S.C.A. § 1951(a). He was sentenced to two years in federal prison, followed by two years of supervised release, and ordered to make restitution of $25,000. Shortly thereafter, this Court temporarily suspended respondent pursuant to Rule 1:20-13(b)(1). In re Cammarano, 202 N.J. 8 (2010). On the basis of the criminal conviction, the Office of Attorney Ethics (OAE) filed a motion for final discipline with the Disciplinary Review Board (DRB), pursuant to Rule 1:20-13(c)(2), recommending disbarment.

The DRB conducted a hearing, noting that, pursuant to Rule 1:20-13(c)(1), respondent's guilty plea and judgment of conviction were conclusive proof that he engaged in the federal crime of conspiracy to obstruct interstate commerce by extortion. It also found that respondent violated the Rules of Professional Conduct (RPC) by committing a criminal act that adversely reflects on his honesty, trustworthiness or fitness as a lawyer, RPC 8.4(b), and by engaging "in conduct involving dishonesty, fraud, deceit or misrepresentation," RPC 8.4(c). A four-member majority of the DRB voted to impose a three-year prospective suspension, opting to spare respondent from

the ultimate sanction of disbarment because he was targeted by a government operation and was a passive participant in the bribe. Two dissenting members voted to disbar respondent.

This Court granted the OAE's petition for review and ordered respondent to show cause on April 9, 2014, why he should not be disbarred or otherwise disciplined.

**HELD:** Respondent's unethical conduct, consisting of offering favored treatment to a private developer in exchange for money, betrays a solemn public trust and undermines public confidence in honest government, thereby warranting his disbarment.

1. The disciplinary review process is intended to protect the public from unfit lawyers and promote public confidence in the legal system. The proper measure of discipline generally depends on a number of factors, including prior disciplinary history and the harm caused by the attorney's transgressions. However, certain violations are so patently offensive to the elementary standards of a lawyer's professional duty that disbarment is per se warranted. Thus, misconduct that breaches a fundamental and solemn trust, such as a lawyer's involvement in a public-corruption bribery scheme, invariably triggers automatic disbarment. (pp. 7-8)

2. The public's confidence in honest government and the democratic system cannot be sustained when bribery is the basis for official decisionmaking. An attorney and office holder who accepts bribes violates both the oath he took as an attorney and the one he took on assuming his public position, and such conduct is wholly incompatible with the high standards expected of members of the bar. Caselaw in New Jersey and other jurisdictions establishes precedent for disbarring attorneys who, as public officials, have accepted bribes in exchange for preferential treatment, as well as attorneys who have themselves bribed public officials. Attorneys who commit such misconduct are unlikely to find refuge in the few exceptions in New Jersey jurisprudence to the general rule that disbarment is the discipline for attorneys who engage in official bribery. Going forward, any attorney who is convicted of official bribery or extortion should expect to lose his license to practice law in New Jersey. (pp. 8-11)

3. Here, the Court disagrees with the DRB majority that the seriousness of respondent's misconduct is mitigated because his betrayal occurred during a federal sting operation. Moreover, the Court did not view respondent as a passive player in the scheme. The Court acknowledges respondent's prior unsullied reputation, service to the community, and expression of remorse, and applauds the steps he has taken to right his life. However, the concerns raised by this case are greater than whether this respondent is capable of rehabilitation. Any discipline short of disbarment will not keep faith with the Court's charge to insure that the public will have confidence in members of the bar and in those attorneys who are privileged to serve as public officials. Consequently, respondent is disbarred. (pp. 11-12)

So Ordered.

**CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, PATTERSON and FERNANDEZ-VINA; and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE ALBIN's opinion.**

IN THE MATTER OF

PETER J. CAMMARANO, III,

An Attorney at Law


Argued April 9, 2014 – Decided September 17, 2014

On an Order to show cause why respondent should not be disbarred or otherwise disciplined.

Melissa A. Urban, Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

Joseph A. Hayden, Jr., argued the cause for respondent (Walder, Hayden & Brogan, attorneys; Mr. Hayden and Kevin A. Buchan, of counsel and on the briefs).

JUSTICE ALBIN delivered the opinion of the Court.

Respondent/Attorney, Peter J. Cammarano, III, during his campaign for Mayor of Hoboken and after his election as Mayor, accepted monies from a cooperating government witness disguised as a developer, and, in exchange, assured him that he would receive expedited zoning approvals for unspecified construction projects. As a consequence, on April 20, 2010, respondent pled guilty in the United States District Court for the District of New Jersey to one count of conspiracy to obstruct interstate commerce by extortion under color of official right, in

violation of 18 U.S.C.A. § 1951(a). Respondent was sentenced to two years in federal prison to be followed by two years of supervised release and ordered to make restitution of $25,000 -- the amount of illicit monies received by respondent. Shortly after entry of the guilty plea, this Court temporarily suspended respondent from the practice of law pursuant to Rule 1:20-13(b)(1). In re Cammarano, 202 N.J. 8 (2010).

On the basis of the criminal conviction, the Office of Attorney Ethics (OAE) filed a motion for final discipline with the Disciplinary Review Board (DRB), pursuant to Rule 1:20-13(c)(2). The OAE recommended disbarment. After conducting a hearing to determine the appropriate level of discipline, a four-member majority of the DRB voted to impose a three-year prospective period of suspension. Two dissenting DRB members voted to disbar respondent. This Court granted the OAE's petition for review.

An elected official who sells his office -- who offers favored treatment to a private developer in exchange for money -- betrays a solemn public trust. This form of corruption is corrosive to our democracy and undermines public confidence in honest government, and its rippling pernicious effects are incalculable. An attorney who engages in this form of public corruption, forsaking his oath of office and the oath taken when admitted to the bar, should expect that he will be disbarred.

2

Accordingly, and for the reasons that follow, an order will be entered disbarring respondent.

I.

Respondent was admitted to the bar of New Jersey in 2002. Before his campaign for Mayor of Hoboken in 2009, respondent practiced at a private law firm where one of his areas of expertise was election law. He enjoyed an unblemished reputation and had never been professionally disciplined. In the four years before the mayoral election, he served as a Hoboken councilman.

In the heat of the mayoral campaign, on April 27, 2009, respondent and two of his political operatives met at a Hoboken diner with a cooperating government witness, Solomon Dwek. Dwek was posing as a real-estate developer in need of zoning approvals for future projects and offered to make illegal campaign contributions for preferential treatment. Dwek, among other things, wanted to know whether he could count on the would-be mayor if "I need a zone change." Respondent assured Dwek, "You can put your faith in me" and "you're gonna be treated like a friend." Respondent also assured Dwek that his name would not be recorded as a contributor. Dwek offered $5000 that day and $5000 following the election. Dwek gave an envelope containing $5000 in cash to one of respondent's operatives after the meeting.

3

On May 8, 2009, respondent and his two operatives met again with Dwek at the diner. In conversation, Dwek said that he would give "five thousand green" to one of the operatives but wanted the matter kept confidential. Respondent responded, "Understood." Dwek also referred to properties that he hoped to develop and wanted assurance that he would have respondent's support to "expedite my stuff." Respondent told Dwek, "I'll be there." Again, after leaving the diner, Dwek handed one of respondent's operatives an envelope containing $5000.

On May 13, 2009, Hoboken held its election for mayor, but no candidate received more than fifty percent of the vote, forcing a run-off between the two highest vote-getters. Respondent, who received the most votes, proceeded to the next stage.

On May 19, 2009, Dwek met again with respondent, the two earlier operatives, and a third associate of respondent's. Dwek said that he had another $5000, which he would give to the associate. To that, respondent replied, "Beautiful," and again assured Dwek that his name would remain confidential. When Dwek asked respondent to make certain not to "forget to expedite my stuff," respondent assured him, "I won't." Respondent described his approach to governing to his diner companions, "breaking the world down into three categories": "people who were with us" from the beginning; those "who climbed on board in the runoff" –

4

– they would have to "get in line"; and those "who were against us the whole way." Those in the third category, respondent explained, would "get ground into powder" and would have to wait "three years" for their projects' approvals, which would be placed at the "[b]ottom of the pile." Respondent told Dwek he was in the preferred group and would have his support. At the close of the meeting, Dwek stated that, after the election, he would give another $5000 when they met again. Respondent answered, "Definitely," and left the diner.

On June 9, 2009, respondent won the run-off election in a very close race.

On June 23, 2009, at a meeting at the diner in the presence of his two operatives, respondent told Dwek that his campaign ran a $19,000 deficit. Dwek offered $10,000 to defray that amount but indicated, "Just don't put my name on anything. I don't want any trace." Respondent assured Dwek, "We're going to be friends for a good long time." Dwek added, "Just make sure you cover my back. Expedite my stuff when it comes in front of you."

On July 16, 2009, at the usual place, Dwek met for the last time with respondent, his two operatives, and his associate. Dwek discussed in general terms properties he might develop in Hoboken, suggesting with respect to one apartment building, "[M]aybe there's an opportunity to go higher, add some density,

5

go wider." Respondent let Dwek know that he had his support, "wholeheartedly." Dwek told respondent that he would give $10,000 that day and another $10,000 the next week so that "we'll be in good graces." Outside the diner, Dwek gave the associate $10,000 in cash in an envelope.

In total, respondent accepted $25,000 from Dwek, giving Dwek the understanding that he had purchased the right to preferential treatment in land-development matters in Hoboken. On July 23, 2009, federal authorities arrested respondent. A week later, respondent resigned as mayor. He had spent just one month in office.

Respondent's guilty plea and judgment of conviction were conclusive proof that respondent engaged in the federal crime of conspiracy to obstruct interstate commerce by extortion. See R. 1:20-13(c)(1). As a result of that conviction, the DRB also found that respondent violated the Rules of Professional Conduct (RPC) by committing "a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects," RPC 8.4(b), and by engaging "in conduct involving dishonesty, fraud, deceit or misrepresentation," RPC 8.4(c).

As noted earlier, a majority of the DRB voted to impose a three-year prospective suspension. The majority "spare[d] respondent from the ultimate sanction of disbarment," in part,

because "respondent was the target of a government operation" and because he "was a passive, not an active, participant in the bribe." In particular, the DRB concluded that "because [respondent] did not orchestrate the scheme, his actions were less serious than those" cases involving attorneys who instigated the payment of bribes.

## II.

This Court is charged with the responsibility of determining the fitness of lawyers to practice law in this State. N.J. Const. art. VI, § 2, ¶ 3. "[T]he purpose of the disciplinary review process is to protect the public from unfit lawyers and promote public confidence in our legal system." In re Gallo, 178 N.J. 115, 122 (2003). Typically, "[t]he proper measure of discipline will depend on a number of factors, including the nature and number of professional transgressions, the harm caused by those transgressions, the attorney's ethical history, and whether the attorney is capable of meeting the standards that must guide all members of the profession." In re Harris, 182 N.J. 594, 609 (2005).

Nevertheless, certain "ethical violations are, by their very nature, so patently offensive to the elementary standards of a lawyer's professional duty that they per se warrant disbarment." In re Conway, 107 N.J. 168, 180 (1987). Thus, "[m]isconduct that breaches a fundamental and solemn trust . . .

7

is itself sufficient to trigger automatic disbarment." Harris, supra, 182 N.J. at 610. Such a breach occurs when a lawyer knowingly misappropriates a client's funds, ibid., and generally occurs when a lawyer is involved in a public-corruption bribery scheme, see In re Coruzzi, 98 N.J. 77, 81 (1984) ("Bribery is viewed as so reprehensible as almost invariably to call for disbarment."); In re Hughes, 90 N.J. 32, 38 (1982) ("[B]ribery of a public official has invariably resulted in disbarment.").

The public's confidence in honest government and our democratic system cannot be sustained when bribery -- rather than the public good -- is the basis for official decisionmaking. The selling of one's office for private gain is a betrayal of a fundamental trust and has the capacity to cast unfair suspicion on all government officers who honestly toil to promote the public's best interests. See In re Callahan, 70 N.J. 178, 184 (1976) ("[B]ribery of public officials [is] a blight that destroys the very fabric of government."). An attorney who, as an office holder, accepts bribes violates both the oath he took as an attorney and the one he took on assuming his public position. Such conduct is wholly incompatible with the high standards expected of members of the bar and tarnishes the repute of an honorable profession. See In re Magid, 139 N.J. 449, 455 (1995) ("Attorneys who hold public office are

invested with a public trust and . . . are held to the highest of standards.").

We have disbarred a judge who accepted bribes in exchange for giving preferential treatment at sentencing, Coruzzi, supra, 98 N.J. at 78, 81; a deputy attorney general who solicited a bribe in exchange for influencing a case before a state licensing board, In re Jones, 131 N.J. 505, 507, 513 (1993); and a county executive who obstructed justice and engaged in mail fraud, in part, by receiving thousands of dollars in unrecorded campaign contributions from a sewer-repair firm that received a no-bid contract, In re Treffinger, DRB No. 04-145 (July 26, 2004) (slip op. at 11), aff'd, 181 N.J. 390 (2004).

In addition, we have repeatedly disbarred attorneys who have bribed public officials. See, e.g., In re Izquierdo, 209 N.J. 5, 5-7 (2012) (disbarring attorney who bribed local zoning official); In re Tuso, 104 N.J. 59, 62-66 (1986) (disbarring attorney who bribed public official); Hughes, supra, 90 N.J. at 34-39 (disbarring attorney who bribed IRS agent); Callahan, supra, 70 N.J. at 179-85 (disbarring attorney for bribing local officials); In re Sabatino, 65 N.J. 548, 554 (1974) (holding that "only appropriate discipline [for conspiracy to bribe public official] is disbarment"); In re Hyett, 61 N.J. 518, 524, 537 (1972) (disbarring attorney who bribed police officer).

9

Other jurisdictions, likewise, have not hesitated to disbar attorneys who have involved themselves in bribery schemes, whether the attorney received a bribe as an officeholder or offered one to influence a public official.  See, e.g., In re Johnson, 48 A.3d 170, 173 (D.C. 2012) (holding that both bribery and extortion under color of official right involve moral turpitude requiring automatic disbarment); Ky. Bar Ass'n v. Carmichael, 244 S.W.3d 111, 115 (Ky. 2008) (holding that prosecutor's abuse of public office in attempting to extort monies under color of official right was aggravating factor warranting disbarment); In re Margiotta, 456 N.E.2d 798, 799-801 (N.Y. 1983) (holding that any attorney convicted of extortion under color of official right shall be automatically disbarred).

We recognize that in our jurisprudence there have been a few exceptions to the general rule that disbarment is the discipline for an attorney who engages in official bribery. See, e.g., In re Caruso, 172 N.J. 350 (2002) (three-year suspension of attorney convicted of brokering bribe for mayor), implementing DRB No. 01-343 (Nov. 15, 2001).  Nevertheless, attorneys taking bribes as public officers and those giving bribes to peddle influence are unlikely to find refuge in such exceptions.  Going forward, any attorney who is convicted of official bribery or extortion should expect to lose his license to practice law in New Jersey.

III.

We disagree with the DRB majority that the seriousness of respondent's professional misconduct is mitigated because he betrayed his office -- even before he assumed the position of mayor -- in a federal sting operation.  Respondent accepted bribe monies that were not reported in accordance with state election laws and that were used to gain an advantage in a close race.  That respondent did not purchase a car or some other item with the illicit monies but rather used those monies to win a professional prize -- the position of mayor -- does not render his conduct less blameworthy.  Moreover, we do not view respondent as a passive player in this corruption scheme. Respondent did not display any timidity or hesitation about accepting bribes in exchange for giving preferential treatment to a developer.  Respondent presented a very clear picture to all those present at those meetings at the diner:  he was open to selling favors in the performance of his official duties. That respondent cannot be characterized as orchestrating the scheme in no way detracts from his culpability.  The public's confidence in government -- a government operating fairly and honestly for the general welfare of the people -- is undermined just as thoroughly by a mayor with his hand out waiting for a bribe as by one actively seeking a bribe.

11

We acknowledge respondent's prior unsullied reputation, his service to the community, the adverse impact of his conviction on his personal and professional life, and his expression of remorse, as well as fifteen letters attesting to his good character. We applaud the steps he has taken to right his life. But the concerns raised by this case are greater than whether this respondent is capable of rehabilitation, of which we have little doubt. Cf. Hughes, supra, 90 N.J. at 36-37 (stating that although "it is unlikely that the attorney will repeat the misconduct, certain acts by attorneys so impugn the integrity of the legal system that disbarment is the only appropriate means to restore public confidence in it").

In the end, we are charged with insuring that the public will have confidence in members of the bar and in those attorneys who are privileged to serve as public officials. In this case, any discipline short of disbarment will not be keeping faith with that charge.

IV.

For those reasons, an order will be entered disbarring respondent from the practice of law in this State.

CHIEF JUSTICE RABNER, JUSTICES LaVECCHIA, PATTERSON, and FERNANDEZ-VINA, and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE ALBIN's opinion.

12

SUPREME COURT OF NEW JERSEY

NO.    D-46                          SEPTEMBER TERM 2013

APPLICATION FOR    _____

DISPOSITION    _Order to Show Cause Why Respondent Should_

_____Not be Disbarred or Otherwise Disciplined_


IN THE MATTER OF

PETER J. CAMMARANO, III,

An Attorney at Law


DECIDED          September 17, 2014    _____

OPINION BY          Justice Albin    _____

CONCURRING OPINION BY    _____

DISSENTING OPINION BY    _____

| CHECKLIST | DISBAR | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | X | |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 7 | |

IN THE MATTER OF    :

PETER J. CAMMARANO, III,    :

AN ATTORNEY AT LAW    :

(Attorney No. 033702002)    :

**FILED**

O R D E R

SEP 1 7 2014

CLERK

It is ORDERED that **PETER J. CAMMARANO, III**, of **HOBOKEN**, who was admitted to the bar of this State in 2002, and who has been temporarily suspended from the practice of law since April 26, 2010, be disbarred, effective immediately, and that his name be stricken from the roll of attorneys; and it is further

ORDERED that **PETER J. CAMMARANO, III**, be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that **PETER J. CAMMARANO, III**, comply with Rule 1:20-20 dealing with disbarred attorneys; and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs and actual expenses incurred in the prosecution of this matter, as provided in Rule 1:20-17.

WITNESS, the Honorable Stuart Rabner, Chief Justice, at Trenton, this 17th day of September, 2014.

The foregoing is a true copy
of the original on file in my office.

CLERK OF THE SUPREME COURT

CLERK OF THE SUPREME COURT
OF NEW JERSEY

2