JUSTICE ALBIN,
dissenting.
Some “ethical violations are, by their very nature, so patently offensive to the elementary standards of a lawyer’s professional duty that they per se warrant disbarment.” In re Cammarano, 219 N.J. 415, 421, 98 A.3d 1184 (2014) (quoting In re Conway, 107 N.J. 168, 180, 526 A.2d 658 (1987)). The sexual exploitation or abuse of children—whether completed or, as in the Legato and Kenyon matters, attempted—is such an egregious violation of societal norms that no discipline short of disbarment will ensure public confidence in the bar or the judiciary’s governance of the bar.
In recommending the disbarment of attorneys Mark G. Legato and Regan C. Kenyon, Jr., for the crimes of attempting to endanger the welfare of children, the Disciplinary Review Board (DRB) recognized that the outrageous conduct of these attorneys *190 justified the ultimate discipline. In making its recommendation, the DRB simply followed this Court’s decision to disbar an attorney for similar conduct in In re Cunningham, 192 N.J. 219, 927 A.2d 1248 (2007).
The public and the bar must have confidence that the Court means what it says. Because I believe that the majority has erred in not adopting the DRB’s recommendation that the Court disbar Legato and Kenyon, I respectfully dissent.
I.
A.
In 2013, Legato pled guilty to third-degree attempting to endanger the welfare of a child by attempting to engage in sexual conduct that would impair or debauch the morals of the child, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:24-4(a), and was sentenced to a special sentence of supervision for life and ordered to comply with the dictates of Megan’s Law. The facts set forth in Legato’s plea colloquy and the DRB decision reveal that Legato engaged in explicit sexual conversations online with a girl he believed to be twelve-years old. The “girl” was a law enforcement officer.
During the online chats, Legato disclosed that he was a forty-three-year-old male, and she stated that she was twelve-years old. During a video chat with the girl, Legato “unzipped his pants and exposed his erect penis.” During their online conversations, Legato asked the girl “to touch herself in her genital area and [told] her that he would like to engage in oral sex with her as well as penetrate her.” Although Legato twice scheduled in-person meetings with the girl, he did not appear on either occasion.
B.
In 2013, Kenyon pled guilty to third-degree attempting to endanger the welfare of a child by attempting to engage in sexual conduct that would impair or debauch the morals of the child, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:24-4(a), and was sentenced to a *191 suspended three-year prison term and a special sentence of supervision for life as well as ordered to comply with the dictates of Megan’s Law. The facts set forth in Kenyon’s plea colloquy and the DRB decision reveal that Kenyon engaged in twenty-one sexually explicit online chats with a person whom he believed was a fourteen-year-old girl. Unbeknownst to Kenyon, the “girl” was a law enforcement officer.
During those online conversations, Kenyon “sent to her images of, and links to, hardcore adult pornography.” In addition to sharing pornographic pictures with the girl, Kenyon “direct[ed] her to masturbate” and arranged to meet with her. Kenyon, however, did not appear at the scheduled rendezvous.
II.
Just three years ago, we acknowledged that, “[t]oday, we are more acutely aware of the long-lasting pernicious effects of sexual crimes against children.” In re Cohen, 220 N.J. 7, 17, 100 A.3d 529 (2014). We also observed that “[u]ntil now attorneys have not had clear notice of the more stringent approach we will take in disciplining attorneys for egregious [sexual] offenses.” Id. at 18, 100 A.3d 529. Clearly, our society and our legal system have undergone a sea change in our understanding of the nature, extent, and effect of sexual exploitation and abuse of children. Sexually abused children are irreparably harmed and permanently scarred. This profound reality must inform our judgment in determining the appropriate level of discipline for sexual-abuse offenses involving children—and must guide us as we form new precedents. Children are the most vulnerable members of our society and the most in need of special protection by our laws and by the legal profession.
The precedent most closely aligned with the case before us is Cunningham, supra, 192 N.J. 219, 927 A.2d 1248. There, we disbarred an attorney for misconduct strikingly similar to the transgressions of the attorneys in this case. Ibid. Cunningham engaged in Internet chats with an undercover officer who was *192 posing as a twelve-year-old boy. In re Cunningham, No. DRB 06-250 (Dec. 21, 2006) (slip op. at 2). In the online conversations, “[Cunningham] described, in lurid detail, certain sexual acts that he hoped to perform on the boy” and “sex acts that he hoped to teach the boy to perform on him.” Id. at 2-3. Although Cunningham planned a sexual liaison with the boy, he never finalized the arrangement. Id. at 3.
Like the attorneys in this case, Cunningham pled guilty to third-degree attempted endangering the welfare of a child, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:24-4(a). Cunningham, supra, 192 N.J. at 220, 927 A.2d 1248. Cunningham too received a special sentence of parole supervision for life and was required to register as a sex offender under Megan’s Law. Cunningham, supra, No. DRB 06-250 (slip op. at 5).
In deciding that a two-year suspension was the appropriate discipline, the DRB noted, “as societal standards evolve, so does our attitude toward this sort of criminal behavior, and that predatory conduct directed at our young children requires more serious discipline.” Id. at 8. This Court rejected the DRB’s recommendation and determined that Cunningham’s “unethical conduct requires that he be disbarred.” Cunningham, supra, 192 N.J. at 220, 927 A.2d 1248 (noting also that Cunningham failed to appear before Court on Order to Show Cause).
The majority acknowledges, “Cunningham paved a path for disbarment” in similar sexual-abuse cases. Ante at 186, 161 A.3d at 119. Yet, the majority does not follow that path. There is no meaningful distinction that separates Cunningham, decided ten years ago, from Legato and Kenyon and no justification for different discipline, particularly given our heightened awareness of the serious and pervasive danger of sexual-abuse crimes against children.
III.
We have recognized that certain species of egregious misconduct so impugn the integrity of the bar and the legal system that, *193 even though the misconduct is unlikely to be repeated, “[n]o sanction short of disbarment will suffice to repair the damage” to the public’s confidence in the bar. In re Hughes, 90 N.J. 32, 36-37, 446 A.2d 1208 (1982). Even when an attorney’s misconduct is unrelated to the practice of law, this Court will disbar attorneys for egregious offenses, as in In re Goldman, 224 N.J. 33, 128 A.3d 694 (2016) (robbery); Cammarano, supra, 219 N.J. 415, 98 A.3d 1184 (public bribery); In re Hasbrouck, 152 N.J. 366, 705 A.2d 350 (1998) (burglary and theft); In re Valentin, 147 N.J. 499, 688 A.2d 602 (1997) (criminal sale of controlled substance); and In re Wright, 152 N.J. 35, 702 A.2d 830 (1997) (aggravated sexual assault).
Indeed, in such cases, we have declined to consider an attorney’s likelihood of rehabilitation as a factor in determining the appropriate sanction. See, e.g., Cammarano, supra, 219 N.J. at 424, 98 A.3d 1184; Hasbrouck, supra, 152 N.J. at 374-75, 705 A.2d 350. That was so in Hasbrouck, supra, a case involving home burglaries by an attorney. 152 N.J. at 370, 705 A.2d 350. There the Court declined to consider Hasbrouck’s drug addiction or the potential for her rehabilitation as mitigating factors. Id. at 374-75, 705 A.2d 350. The Court disbarred Hasbrouck, noting that “[s]ome criminal conduct is so utterly incompatible with the standard of honesty and integrity that we require of attorneys that the most severe discipline is justified by the seriousness of the offense alone.” Id. at 371-72, 705 A.2d 350.
The Court came to the same result in Cammarano, supra, a case involving an attorney who, during a law-enforcement sting operation, accepted bribes to fund his election campaign for Mayor of Hoboken. 219 N.J. at 417-20, 98 A.3d 1184. There, the Court disbarred the attorney despite noting his “prior unsullied reputation, his service to the community, the adverse impact of his conviction on his personal and professional life, and his expression of remorse.” Id. at 424, 98 A.3d 1184. Although the Court “applaud[ed] the steps he ha[d] taken to right his life,” it held that “the concerns raised by this case are greater than whether this *194 [attorney] is capable of rehabilitation” and that our charge is to ensure “that the public will have confidence in members of the bar.” Ibid.
The Court has taken a similar position in cases involving attorneys who knowingly misappropriate client funds, regardless of the amount taken or whether the attorney made repayment before the theft was discovered. See generally In re Wilson, 81 N.J. 451, 409 A.2d 1153 (1979). In requiring disbarment in such cases, the Court has expressed its understanding of the stressors that might prompt an attorney knowingly to invade a client’s trust account—financial desperation and family crises, id. at 457-60, 409 A.2d 1153, mental illness, alcoholism, and drug addiction, see In re Greenberg, 155 N.J. 138, 161, 714 A.2d 243 (1998). In such cases, the Court has accepted “the very real possibility of reformation, which would result in the creation of a new person of true integrity, an outstanding member of the bar.” Wilson, supra, 81 N.J. at 460, 409 A.2d 1153.
Despite the potential for personal reformation and the severity of the discipline in such cases, we concluded that no result other than disbarment would satisfy the need for “continued confidence of the public in the integrity of the bar and the judiciary.” Ibid. The maintenance of public confidence in the bar and our legal system has been the overarching goal of our disciplinary jurisprudence, even if the discipline in individual cases is seemingly harsh.
It is difficult to reconcile the majority’s position that those, such as Legato and Kenyon, who attempt to commit sexual crimes against children are worthy of reformation and rehabilitation but that those who are driven by desperation to invade a trust account or those who commit other crimes, e.g., burglary or sale of drugs, are not. Was the bribe-taker in Cammarano less worthy of rehabilitation than Legato and Kenyon?
IV.
In Cohen, supra, a case involving an attorney who possessed and viewed child pornography on a state computer, we imposed an *195 indeterminate suspension and put the bar on notice that such offenses in the future might result in disbarment. 220 N.J. at 9-10, 18, 100 A.3d 529. There we said: “[Attorneys must be on notice that engaging in this form of unlawful activity may be considered grounds for losing the privilege of membership in a distinguished and trusted profession.” Id. at 18, 100 A.3d 529.
The depraved actions of Kenyon and Legato exceeded the misconduct in Cohen because they engaged not only in explicit sexual conversations with individuals they believed to be young girls, but also coached them to engage in sexual acts. Unlike Cohen, Kenyon and Legato directly attempted to debauch the morals of minors. Although Kenyon and Legato were mistaken about the identity of the young girls, there is no mistaking their intent. In disbarring Cammarano, it made no difference that the bribe the attorney took was from a government informant. Cammarano, supra, 219 N.J. at 423-24, 98 A.3d 1184. It should make no difference that Kenyon and Legato revealed themselves to undercover law enforcement officers rather than to real children.
Legato and Kenyon, moreover, are subject to parole supervision for life and cannot be released from that supervision for a period of fifteen years. The Court nevertheless keeps open the possibility that they might be eligible for reinstatement even while they are under parole supervision. The indeterminate suspension clearly is not the equivalent of disbarment, which is the reason I have parted from the majority.
To be clear, I do not question that Legato and Kenyon are capable of rehabilitating and redeeming themselves and becoming successful and productive members of society. I hope that they accomplish those goals for their benefit and the benefit of their families and communities. The practice of law, however, is a high calling and a privilege, not a right. I believe that our jurisprudence calls for the permanent revocation of that privilege in these egregious cases to ensure the paramount goal of public confidence in the bar and the disciplinary process.
*196 V.
Our decisions in disciplinary cases must not be idiosyncratic, but based on principles that consistently apply to similarly situated attorneys. Our precedents, moreover, should matter. Attorneys must know that there are certain lines that can never be crossed if they intend to retain the privilege to practice law. In my opinion, that line was crossed in these cases.
I therefore respectfully dissent.